# EMELIA A. NELSON v. CREAMERY PACKAGE MANUFACTURING COMPANY AND ANOTHER.[1]

April 9, 1943.

No. 33,440.

*Reynolds & McLeod,* for relators.

*R. G. Shepley,* for respondent.

YOUNGDAHL, JUSTICE.

*Certiorari* to review a decision of the industrial commission affirming a referee's award of compensation for the accidental death of respondent's husband.

[1]Reported in 9 N. W. (2d) 320.

On July 30, 1941, and for many years prior thereto, John Ludwig Nelson, hereinafter referred to as employe, was in the employ of the Creamery Package Manufacturing Company, relator employer herein, as a machine operator on a piece-work basis. He operated two machines described as a sanding machine and a ring puller, alternating between the two, with one hour's work on each machine. The record is somewhat vague as to exactly what this machinery consisted of, but the operation thereof seems to be substantially this: When working on the sanding machine, employe would lift the butter tubs, estimated to weigh from five to ten pounds each, as they were pushed out of the ring puller in front of him up on to a chuck or spindle, and by means of a mechanical device would swing the tubs over onto the sanding belt. This was a "double feature" operation, with one tub on each side of the machine. When the tubs were completely sanded they were removed and others lifted into place. While operating the ring puller, he would receive the tubs from a machine before him, turn them over, fit them with mouth rings, and the tubs were then pushed against the ring puller, which fed the rings in automatically. On the day in question employe was working with a half crew and had the additional duty of putting hoops on the tubs. On this basis, he would handle an average of 250 tubs an hour, with a daily output of approximately 2,000 tubs.

Employe worked on the second floor of a two-story brick building with a flat roof covered with tar paper. His particular workroom, where eight other employes worked, was 10 to 12 feet high with a floor space of 40 by 60 feet. There were six or seven windows on both the north and south sides, affording cross-ventilation, although there was another building adjacent to the north about ten feet away. Employe's machine was located within a few feet of the south windows. There was one door opening on the north side. The east and west walls were without windows or doors. On one side of a canopy, opening to the roof, was a 4 x 4 window. In the room were two electric power motors, one of which was used to drive seven or eight machines, and the other operated an

exhaust fan to remove the dust created by the process of fabricating the materials used.

For several days prior to July 30, 1941, the heat had been oppressive, with temperatures fluctuating from 80 to 103 degrees. At 3:00 p. m. on that day the recorded temperature was 87 degrees, and the relative humidity ranged from 46 percent at 12:30 p. m. to 49 percent at 6:30 p. m.

Although doing his usual work and apparently in good health at his age of 60 years, and without a record of recent medical attention, employe collapsed about 3:30 p. m. on July 30, 1941. He was immediately taken to the hospital, where he died two days later. It is undisputed that he died of heatstroke.

Relators' assignments of error are (1) that the decision of the industrial commission is null and void by reason of the fact that only two members of the commission presided at the hearing and did not agree as to the result reached; and (2) that the death of John Nelson did not result from an accident arising out of his employment.

■ This court in its recent decision in Barlau v. Minneapolis-Moline P. I. Co. 214 Minn. 564, 9 N. W. (2d) 6, held that where the members of the industrial commission are equally divided in opinion on an appeal from a referee's decision awarding compensation, an affirmance of the referee's decision occurs by operation of law. This subject was exhaustively treated therein, and further discussion is unnecessary here.

■ It is undisputed that employe died from a heatstroke sustained by him in the course of his employment. Relators, moreover, concede that heatstroke is an accidental injury as established by State ex rel. Rau v. District Court, 138 Minn. 250, 164 N. W. 916, L. R. A. 1918F, 918, and followed in subsequent cases. The sole issue presented here, therefore, is whether the heatstroke arose out of the employment.

Relators contend that the surroundings and conditions under which employe worked in no way contributed to the heatstroke; that the labor he was performing was no different from that which

he had been doing over a period of years and was not a contributing element in the stroke, but that the stroke resulted from the natural oppressiveness of the heat of that day and preceding days and bore no relation to the employment. Respondent does not claim that there was anything about the place itself in which employe worked that contributed to the stroke. She concedes that the ventilation was good; that it was cooler on the second floor than outside in the sun, although warmer than on the first floor. Nor does respondent claim that any appreciable amount of heat was generated from the two electrical motors or the machinery in operation on the premises. It is respondent's contention that employe's type of work, together with the rapid manner in which it was required to be performed and the natural heat of the day, all directly contributed to bringing on the stroke.

Although we have previously approved awards of compensation in a number of heatstroke cases where the place and conditions under which employe worked were involved, we have not heretofore determined the precise question presented by the factual picture here, *viz.*, whether death caused by heatstroke is compensable when it is contributed to only by the character and manner of performance of the work of the employe rather than by the working environment alone or a combination of the type of work performed and working conditions.

The particular duties of employe in the instant case, while relatively light insofar as a single operation was concerned, required considerable speed. A fellow employe, doing identically the same work, described it thus: "It's so much of it, it's so fast, it's—well, you got to work so fast together, it's quite an effort." When interrogated further as to the difference of speed of operation between a full crew and a half crew, he said, "I really don't know, but—you work at top speed, no matter what you do, so I can't say exactly." In commenting on the "double feature" operation of the sanding machine, he testified, "There are two arms on the sander, so you move from one to the other all the time." When asked how far he moved from one arm to the other and with what

speed, he replied, "Two, three steps each time. * * * You take them fast." The factory foreman, who had also performed the same work as employe, was asked, "As far as the two jobs themselves they are both fairly light?" to which he replied, "They are light, but the sander is faster and you have to move fast." Employe was working on automatic machinery that required alertness, exactness, and the utmost attentiveness and concentration of effort. He worked steadily for an hour and then was permitted a two- or three-minute rest period, after which he resumed his work for another hour. Except for this brief respite after each hour, the particular work in which he was engaged exacted of him continuous, incessant effort at top speed. That his activity in moving rapidly and continuously from one part of the machinery to the other in the process of sanding the tubs and placing the rings thereon generated substantial heat in his body and was a causal factor, together with the natural heat of the day, in producing the stroke seems to us cannot be reasonably refuted. In State ex rel. Nelson v. District Court, 138 Minn. 260, 262, 164 N. W. 917, 918, L. R. A. 1918F, 921 (cited and approved in Pearson v. Ford Motor Co. 186 Minn. 155, 242 N. W. 721—a heatstroke case), the court granted compensation for an injury caused by freezing. In discussing injuries resulting from lightning, storms, sunstroke, etc., the court approved the language in 22 Quebec K. B. 432, 433, 12 D. L. R. 303, 7 N. C. C. A. 982, as follows:

"But where the work, or where the conditions under which it is carried on, expose the employees to the happening of a force majeure event, or contribute to bring it into play or to aggravate its effects, then we are no longer face to face with the sole forces of nature. This is no longer a risk to which everybody is exposed; this is a danger which threatens more particularly the employees who work under special conditions. Hence the occurring of a force majeure event under such circumstances is an accident arising out of the employment."

Medical testimony in the record is in agreement that two of the

prime causative factors in producing the cumulative result of heatstroke are heat and activity, and upon the evidence relating to the speed with which employe worked the medical experts were in accord that his great activity tended to increase his metabolism, with a resulting loss of body salts and a consequential throwing off balance of his heat regulatory center. The two physicians testifying for respondent were agreed that the work of employe definitely contributed to the heatstroke, while the two appearing for relators were of the opinion that employe had less chance of having a heatstroke under the circumstances of his work than he would have on the outside. This evidence, at the most, presented a fact question for the commission to·determine and, having decided it adversely to relators, it cannot be disturbed on review when there is reasonable evidence to sustain it. Hill v. Umbehocker, 201 Minn. 569, 277 N. W. 9; Schroepfer v. Hudson, 214 Minn. 17, 20, 7 N. W. (2d) 336.

Of course, all persons are subject to the natural risk of heatstroke, whether at home, at work, or any other place, and heatstroke resulting solely from such natural risk is not compensable. But where the employment is such that it accentuates the natural risk which is connected with and reasonably incidental to the employment as distinguished from the ordinary risk to which the general public is exposed from climatic conditions, the injury "arises out of the employment" and is compensable. 15 Minn. L. Rev. 802; Ueltschi v. Certified Ice & Fuel Co. 201 Minn. 302, 276 N. W. 220. It is not necessary that employe be exposed to risks greater than other employes in the same or similar employment. The question is whether in the performance of his duties he was exposed to the danger to a greater extent than the ordinary person in that locality. As the court said in Pearson v. Ford Motor Co. 186 Minn. 155, 159, 242 N. W. 721, 722:

"That the work or risk was common to all working in the glass department is not important or that it was not unlike that in

many other employments. The risk was a necessary incident of this employment."

Nor does the fact that the stroke came to decedent while at his usual work prevent recovery of compensation. Pearson v. Ford Motor Co. *supra*. "Although the risk may be common to all who are exposed to the sun's rays on a hot day," the controlling thought that has found expression in practically all heatstroke cases is whether the employment exposes the employe to the risk. McDonald v. Fulton & Runquist, 187 Minn. 442, 443, 245 N. W. 635, 636. This rule has been followed in other jurisdictions. See Hughes v. Trustees of St. Patrick's Cathedral, 245 N. Y. 201, 203, 156 N. E. 665; McCarthy's Case, 232 Mass. 557, 123 N. E. 87.

Squarely in point on the precise question raised here is the case of Ciocca v. National Sugar Ref. Co. 124 N. J. L. 329, 12 A. (2d) 130. There the court of errors and appeals, reversing the supreme court of New Jersey, awarded compensation on a state of facts much less impressive than those before us in the instant case. In that case the work of the employe consisted chiefly of sweeping up sugar from the floor into buckets, splicing rope slings used in hoisting the sugar bags, and such other work as occasion from time to time demanded. He suffered a heatstroke while engaged in his usual duties. It was urged by the employer there, as it is here, that, because it was cooler where employe worked than on the outside and because it was not shown that the ventilation was poor or that the employment did not subject employe to greater exposure than that to which persons generally in that locality were exposed, his prostration and death did not arise out of his employment. The court refused to sustain this position, holding that, while unusual strain, effort, or exertion on the part of an employe in his employment may form the basis for a determination that he has suffered a compensable accident, it is not necessary to show extraordinary effort or exertion, and that a compensable accident arises out of the employment when the proofs show that (124 N. J. L. 334, 12 A. [2d] 133) "(1) the employment was one of the

contributing causes without which the accident would not have happened and (2) that the accident was one of the contributing causes without which the injury or death would not have resulted." The facts in the instant case are much stronger, in that employe here was subjected to a strain of rapid, continuous, and intensive activity, and thus the evidence clearly establishes a compensable accident.

Without hesitation, therefore, we reach the conclusion that the commission was justified in finding from the evidence that the character and manner of performance of employe's work directly contributed to the heatstroke, which he would not have suffered but for the fact that he went to the factory on a hot day and worked at a job requiring steady, rapid, and concentrated activity on his part, which accentuated the natural risk of heatstroke, and that there was a causal connection between his death from heatstroke and the type of work he was required to perform and the risk attached thereto. His accidental death, therefore, arose out of his employment. 6 Dunnell, Dig. & Supp. § 10404; Pearson v. Ford Motor Co. 186 Minn. 155, 242 N. W. 721, *supra,* and cases from other jurisdictions there cited.

Our conclusion is strengthened by the oft-repeated rule expressed in Moore v. J. A. McNulty Co. 171 Minn. 75, 213 N. W. 546, that the workmen's compensation act is highly remedial and should not be construed so as to exclude an employe from the benefits thereof unless it clearly appears that he does not come within the protection of the act.

Writ discharged and order affirmed.