# LAWRENCE C. ROMAN v. MINNEAPOLIS STREET RAILWAY COMPANY.

## 129 N. W. (2d) 550.

### June 19, 1964—No. 39,228.

*Lasley & Foster,* for relator.

*Feidt, Lang, Welsh & Kuehn* and *Jerome H. Lewis,* for respondent.

NELSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission denying compensation to relator, Lawrence C. Roman, a former employee of Minneapolis Street Railway Company, also known as Twin City Rapid Transit Company, a self-insured employer.

Relator sustained an accidental injury which arose out of and in the course of his employment on August 20, 1940. He was 23 years of age at the time of the accident, which occurred when he was working on a boiler platform and fell some 25 to 30 feet to a concrete floor below. He landed primarily on his face, suffering a fractured skull, fractures of left wrist and ribs, and a severe injury to his left eye resulting in partial loss of vision in the eye. He was taken to St. Barnabas Hospital and confined there for two weeks in the care of a Dr. Fitzgerald, since deceased. The hospital records indicate that he was unconscious for two days or more and that on the fourth day after admission he complained of pain and stiffness in his neck on three different occasions. There is no record of any X rays having been taken of employee's neck or further mention of his neck complaints in the nurses' notes after the third occasion. He remained off work for 8 weeks following this accident and was paid workmen's compensation benefits for this period which totaled $648.69—$510.40 for permanent partial disability of his left eye resulting from this fall and $138.29 for temporary total disability over a period of 55 days. He was also paid $328.08 for hospital and medical expenses incurred.

Following this period of disability relator returned to his regular job. He noticed, however, that his left foot dragged when he walked, but did not relate this to the accident.

In August 1941 he was involved in an automobile accident and was hospitalized for 5 days because of a deep facial laceration. He entered the Army in March 1942 where he remained until June 1945. While in the Army he experienced headaches, vertigo, double vision when he looked to the left, and the same difficulty with his left foot. In February 1944 he was relieved of general combat duty and assigned to a noncombatant unit on the recommendation of an Army medical board.

While it does not appear that the board was not aware of the condition of relator's left foot, it based its action on the other conditions which it attributed to relator's fall on August 20, 1940. The report of the medical board (relator's exhibit R) indicates how

thorough was the consideration the board gave relator's case at a meeting held December 23, 1944. This report stated in part:

"The patient is a 27 year old Tec 4th Gr., who was admitted to hospital for hepatitis and jaundice, characterized by nausea and vomiting in July 1944. While in the hospital he requested care for his headaches. He has recovered from his jaundice and hepatitis.

"In 1940 the patient had a severe head injury. He was unconscious for two days, had orificial bleeding and a fractured skull. He was in the hospital for two weeks and convalescent for four to six weeks afterwards. Thereafter he engaged in lighter work. He had to take time off periodically because of frequent headaches.

"In the service, he had headaches every four to seven days lasting a few hours, sometimes twenty-four hours. He had attended sick call to obtain aspirin and was treated with consideration by the officers. He functioned well, but said there were times that he felt he could not go on and became very nervous. He said that on looking to the left he sees double. He had suffered frequent tinnitus and his memory has become poor and his mind sluggish. He has also had vertigo on change of position or at times when walking. * * *

"On examination, the patient appeared deliberate and slow of speech. His hands were cold and cyanotic and his face was flushed. There was a slight sway backwards in the erect position. The remainder of the physical and neurological examinations were negative.

"X-ray of skull was negative on 15 November 1944.

\* \* \* \* \*

"Eye consult revealed diplopia, horizontal, left, due to head injury in August 1940, and the consultant advised that he be relieved of duty as driver.

\* \* \* \* \*

"*Because this man suffers from sequelae of a severe head injury in the form of headaches, diplopia, vertigo, memory and difficulties, he is not fit for general duty but can function in permanent limited assignment capacity.*

"After a thorough examination of the patient and his clinical records, the Board finds that the diagnosis is as follows:

"1. *Post traumatic syndrome, result of head injury in August 1940, manifest by headaches, diplopia and vertigo.*" (Italics supplied.)

Upon relator's discharge from the Army he returned to his regular job. It appears that sometime in the period from 1947 to 1950 relator experienced numbness and pain in his left arm. For relief he consulted a doctor of the employer. The doctor suggested that relator might have bumped his arm although he did not recall having done so. He recalled bumping his right shoulder in 1950, but there is nothing in the record to indicate that this bump was in any way related to the numbness and aching in the arm. The condition in both his left arm and foot gradually became worse. By 1955 relator experienced numbness and tingling shock sensations in both arms when they were outstretched and numbness and stiffness in both legs.

During the months of August and September 1956 relator's difficulties became more prominent. There was stiffness in both legs as well as numbness and a loss of position sense; numbness in his hands; shaking movements in his hands and arms; and shock sensations in his arms when he reached forward or bent his back; and pain in his back at the level of his kidneys. At this time he consulted Dr. Leonard A. Titrud, a neurosurgeon, and was hospitalized on October 7, 1956. By performing a cervical laminectomy Dr. Titrud discovered a protrusion of the intervertebral disc[1] between the fifth and sixth vertebrae which had caused a 50-percent reduction of the spinal canal and adhesions between the membranes (dura mater and arachnoid) which enclose the spinal cord. These adhesions were cut and the degenerative disc material removed. Relator, after convalescing from the surgery, returned to work in April 1957. An examination by Dr. Titrud in June 1957 indicated improvement in relator's condition.

On July 29, 1960, relator again consulted Dr. Titrud and related the same complaints as in 1956. Dr. Titrud performed another cervical laminectomy. He found no further protrusion of the intervertebral disc

---

[1]The disc was "herniated," which means that it had protruded through an abnormal body opening. Webster's Third New International Dictionary (1961) p. 1060.

but discovered that adhesions of the membranes to the spinal cord had developed; that the spinal cord had grown smaller; and that there was an increased number of blood vessels over the surface of the spinal cord. He concluded that progressive degenerative spinal-cord changes were occurring and that these accounted for relator's difficulties.

As a result, Dr. Titrud had relator transferred to the Kenny Institute for physiotherapy and rehabilitation on September 6, 1960. Relator left the Kenny Institute January 6, 1961, but never again returned to work. When relator left the Kenny Institute, his doctor was of the opinion that he had had degenerative spinal cord function because of the traumatic effect of the massive intervertebral disc protrusion. He has lost considerable function of his extremities, resulting in total permanent disability.

On May 25, 1961, he filed a petition seeking compensation for total disability from July 27, 1960, the last day on which he worked. The employer denied liability, insisting that there is no causal connection between the accident which occurred in 1940 and relator's present condition. The referee, finding that there was, awarded compensation, but on appeal the Industrial Commission reversed, specifically finding that relator's present disablement "is not in causal relationship to the employment-related injury of August 20, 1940."

The sole question before us is whether the present disability was caused wholly or in part by the accident of 1940.

The doctors who testified before the referee agreed that relator had become permanently and totally disabled, but disagreed on the cause of his condition. Dr. Titrud, testifying in behalf of relator, admitted that disc problems can arise from the degenerative process associated with aging without any appreciable incident of trauma. However, with regard to relator's case he testified:

"Q. And did you form an opinion at [the time of the first operation, October 11, 1956] as to the cause of this condition that you found upon surgery as to whether it was a degenerative disease type of thing or something that had been caused from trauma?

"A. Yes.

"Q. Will you state that?

"A. And at that time I commented in the 23rd of October, 1956, letter to Dr. Nylander about this patient that it was entirely possible that the severe injury he had so long ago in 1940 brought about disc injury with ligament weakness and the chain of events leading eventually to protrusion of the intervertebral disc now between the 5th and 6th cervical vertebrae.

"Q. Was that then your opinion at that time?

"A. Yes.

\* \* \* \* \*

"A. \* \* \* his difficulty now is as a result of the effects of injury.

"Q. That injury of 1940?

"A. Yes.

\* \* \* \* \*

"Q. And it [the disc protrusion] also would fit the pattern of a degenerative type of disc, would it not?

"A. Yes, because disc troubles are always degenerative, they get a substantial injury to a part of the body like a part of the spine and it is very seldom we see a disc protrude at the time. \* \* \* as time goes in terms of months and even years, the degenerative effects of injury result in further ligament stretching, disc losing more blood supply and it eventually herniates out—sure, that is all degenerative, but it is all a result of the substantial injury that started the whole thing off, that is why it is called a herniating disc, it is a gradual loosening of material and a gradual pushing out.

\* \* \* \* \*

"A. \* \* \* he had presumably soft tissue injury of a straining type in his neck and then as time went by then the ligaments around his neck were somewhat weakened as a result \* \* \* the disc tissue has lost some of its blood supply, has got some looseness from the bone surface, and that over the passage of time with head and neck movements and some wear and tear, this disc material further degenerates \* \* \* and eventually it gets to the point where the disc tissue just starts to leave its normal position which is ordinarily towards the back, in which area the spinal cord runs, and it was evident this was a slow process from the adhesions and scar tissue formation and small blood

vessel formations which we saw at surgery that it had been going on gradually over a long time and eventually there was enough spinal cord effect to actually disable him and that is when he came for treatment."

Dr. Harold F. Buchstein, a neurosurgeon called by the employer, testified:

"Q. Doctor, from the history that Mr. Roman gave you and your examinations and also your investigations into Mr. Roman's hospital records do you have an opinion as to the possibility of the 1940 fall causing the disc problem that apparently arose some time in 1956?

"A. Yes.

"Q. And could you give us that opinion?

"A. Well, it appears from a survey of the patient's hospital records of 1940 that no injury to the neck was considered or diagnosed by his attending physicians at that time. No X-rays of the cervical spine were made, which would seem to imply that his physicians were not concerned about his neck.

*"It is true that any injury to the head may involve a concomitant injury of some degree to the patient's neck,* but it is also true, of course, that one's neck is subject to more or less constant traumatization—using that word in the broad sense—during all of life. The neck—one's neck is constantly in motion, and it is a common observation that many people develop marked degenerative changes in their cervical intervertebral discs in the course of life without the intervention of any specific traumatic episodes. * * * the interval between 1940 and 1956, when the lesion was operated upon, is a very long one, and allows for the—an intervening period during which a good many things could have happened to this patient's neck which might have had some bearing on the—his eventual difficulties; these things will not, from a medical point of view at any rate, very often result in a single episode; this represents a culmination of a degenerative process which * * * is probably contributed to by a great many things.

* * * * *

"Q. And when we talk about degeneration, we talk about the aging process, that is something that happens to all of us without trauma or accident.

"A. I think in this particular situation we're talking about the result of an aging process, the result of the wear and tear incident to constant use of the body. I think it's difficult to segregate this into *how much is trauma and how much is normally aging,* if that were the proper phrase.

"Q. As we go through day by day life, the neck is, however, subject to constant traumatization, is it not?

"A. Yes.

"Q. And this in and of itself can cause cervical discs.

"A. Well, we certainly see individuals who have cervical disc trouble who do not give any history of any specific accidental injury to the neck.

"Q. From the fact that there was a 16-year interval from the time of the 1940 incident to the time of the surgery and apparently the time when the difficulties arose, would it not be a fair inference to say that the trauma of everyday life caused the disc rather than an isolated incident some 16 years back?

"A. Well, I would perhaps restate this a little bit by saying *it would appear to me unreasonable to attribute the cause of this situation to an isolated trauma 16 years previously.* I'm thinking now of this—in trying to think of this in legal rather than medical terms, in which one is trying to attribute this situation to a specific incident, and if this is what we're trying to do, then it would appear unreasonable to me to choose this incident 16 years earlier." (Italics supplied.)

On cross-examination he gave the following opinion:

"Q. Assuming, Doctor, that there were no other trauma to this man's neck aside from what you have taken a history of, and assuming further that he had progressive trouble over the years of aching in the left arm and some numbness and some loss of feeling in his left foot and inability to control it so that he had some stumbling incidents when he walked upstairs, and on one of these occasions actually stumbled and fell, and he had to seek the care of a doctor for injuries he actually suffered in these falls because of his left leg dragging, and that these symptoms were gradual, they became progressively worse, and the progression was very rapid in 1955 and 1956 resulting in

his seeking medical care and having surgery in 1956, and then seeing you in 1957 with the symptoms that he had at that time, do you feel that the history I have just given to you would be consistent with a disc protrusion in 1955 or '56, which was initiated by a trauma which occurred from the fall in 1940?

"A. *Well, I think if one accepted the situation exactly as you depict it in your question, then one might say that the fall of 1940 had initiated the situation which eventually in 1956 eventuated in a disc protrusion.*" (Italics supplied.)

In a letter dated August 16, 1957, Dr. Buchstein also stated in part:

"It appears then that this man took a considerable tumble in 1940 and if, as appears very probably, he landed largely on his face, it is evident that *he also subjected his neck to a considerable stretch and strain at that time.* He evidently *complained of this on at least one occasion during his hospital stay,* but the physicians in attendance were apparently not sufficiently impressed with this complaint to make any further notation or investigation of it. It may be noted in passing that *it is almost impossible for an individual to sustain a severe head injury without having a concomitant neck injury* simply by virtue of the anatomy of the situation.

\* \* \* \* \*

"\* \* \* *The injury of 1940 may very well have played the role in traumatizing this disc, but it certainly seems unreasonable to assign major responsibility to one isolated injury in the course of a 16-year period, when there must have been innumerable other traumata to this disc.* It would appear to be that the burden of proof is on the individual who would hold this episode responsible for a disc protrusion 16 years later." (Italics supplied.)

■ We have in mind the often-repeated rule, expressed in Moore v. J. A. McNulty Co. 171 Minn. 75, 213 N. W. 546, that the Workmen's Compensation Act is highly remedial and should not be construed so as to exclude an employee from the benefits thereof unless it clearly appears that he does not come within the protection

of the act. See, Nelson v. Creamery Package Mfg. Co. 215 Minn. 25, 9 N. W. (2d) 320.

 This court is not the trier of fact in workmen's compensation cases. Our only function is to ascertain whether the findings are supported by inferences reasonably drawn from the facts, it being immaterial where the preponderance of the evidence rests.[2] We will not disturb the commission's findings unless the evidence and permissible inferences therefrom are such as to require reasonable minds to reach a contrary conclusion,[3] or it is clear that reasonable evidence is lacking to sustain its findings.

We said in Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 442, 215 N. W. 678, 679:

"It is for the triers of fact to choose not only between conflicting evidence but also between opposed inference. * * * It is only where the inference upon which the challenged finding rests is not itself reasonably supported or where it is clear that the whole evidence is in manifest and undeniable preponderance against it (even though there is some support for it in the evidence) that there should be a reversal."

Ordinarily we are reluctant to reverse the findings of the commission.[4] It appears to us, however, from the record herein, and particularly from the medical testimony when taken as a whole, that it establishes beyond question that there was a causal connection between the accident, the resulting injury, and the herniated protruding intervertebral disc which resulted, even though considerable time elapsed between the injury and the first operation.

██ The question here is whether the whole of the evidence of the medical testimony furnishes any legal basis for the decision arrived at by the majority of the commission. It is not enough that there was medical testimony on both sides to circumscribe the decision ar-

---

[2]Casey v. Northern States Power Co. 247 Minn. 295, 77 N. W. (2d) 67; Anderson v. Armour & Co. 257 Minn. 281, 101 N. W. (2d) 435.

[3]Schmillen v. Dave Schroeder Grocery, 250 Minn. 561, 85 N. W. (2d) 740; Casey v. Northern States Power Co. *supra*.

[4]See, generally, 21 Dunnell, Dig. (3 ed.) § 10426.

rived at as one based only on fact determination. The duty of this court is not ordinarily performed without examining the evidence to ascertain whether it has substance to support a decision one way or the other. That is simply the exercise of an appellate judicial function.

 It is well recognized that in the chain of causation between an accident and the resulting injury medical testimony generally forms a very important part, in many cases the convincing part. Hill v. Umbehocker, 201 Minn. 569, 277 N. W. 9.

Here, however, as a matter of law the medical testimony does not support the decision of the commission. (This was pointed out quite clearly by the dissenting member.) In his medical report of May 16, 1957, Dr. Buchstein clearly indicated that it was entirely possible that the relator sustained an injury to his neck at the time of the fall in 1940. He expressed the opinion, however, that "legally" the disability and the accident should not be tied up. However, Dr. Buchstein found the necessary causal connection, apparently without any realization that he was doing so, when he gave his opinion that the injury of 1940 "may very well have played the role in traumatizing this disc." His later statement to the effect that "there must have been innumerable other traumata to this disc" is purely conjectural and has no relevance to the question under consideration. At another point, referring to the relator as having taken a considerable tumble in 1940, he commented that the physicians in attendance were apparently not sufficiently impressed with the complaint made by relator about his neck to make any further notation or investigation of it, but added: "It may be noted in passing that it is almost impossible for an individual to sustain a severe head injury without having a concomitant neck injury simply by virtue of the anatomy of the situation." Dr. Buchstein never saw or made an examination of relator until 1957, and this was after Dr. Titrud had performed the first operation.

Dr. Titrud, a neurosurgeon of wide experience, testified positively that in his opinion relator's disc condition was a result of the substantial injury suffered in 1940. That injury, he felt, "started the whole thing off," explaining that "that is why it is called a herniating disc, it is a gradual loosening of material and a gradual pushing out." He

stated without hesitation that the relator's difficulty was, in his opinion, caused by the employment-related injury relator had sustained 16 years prior to the time of the first surgery. On the other hand, Dr. Buchstein's testimony indicates that he evaded coming directly to grips with that question.

Instances frequently appear where the direct connection between trauma and disease is apparent without medical testimony, or if the connection is not evident otherwise, medical testimony may make it so. Furthermore, the intervention of disease or degeneration as the mere "terminal cause" does not relieve from liability. If the herniated protruding disc came about independent of any injury or trauma then, of course, there could be no recovery of compensation. But, as we see it, the whole point is that here under established law the testimony cannot properly be given the effect of creating a fact issue. As we see it, Dr. Buchstein's testimony is almost wholly based upon conjecture and speculation, except where he is in agreement with Dr. Titrud. Clearly, the majority decision cannot stand on such unsupported speculation and conjecture even though it may come from a professional source. Honer v. Nicholson, 198 Minn. 55, 268 N. W. 852.

In Susnik v. Oliver Iron Min. Co. 205 Minn. 325, 331, 286 N. W. 249, 252, we said:

"* * * In denying validity for the two hypotheses for claimant, we have applied to opinion testimony, on which they were based, the simple rule that an affirmative finding cannot be sustained upon mere conjecture, as distinguished from real deduction. This rule applies to opinion evidence, even that of the best experts. [Citing Honer v. Nicholson, *supra*.] It governs in weighing all evidence and its analysis for purposes of decision."

█ It is a well-established rule in negligence law that a wrongful act may be the legal cause of damage though other causes may have joined in producing the final result. The question is whether the defendant's negligence was a substantial factor in bringing about the injury complained of. If it is established that the negligence of the de-

fendant was either the sole cause or a substantial contributing cause of the injury, plaintiff is entitled to recover.

Similarly, to be entitled to workmen's compensation it is not necessary for relator to show that the 1940 fall was the sole cause of the disc protrusion which has produced his permanent and total disability. In Daly v. Bergstedt, 267 Minn. 244, 126 N. W. (2d) 242, we quoted Murray v. Industrial Comm. 87 Ariz. 190, 199, 349 P. (2d) 627, 633, in which the Arizona court stated:

"* * * The law * * * recognizes more than one cause for a particular injurious result."

It is only necessary for relator to show that the 1940 fall was a "legal cause" of the disc protrusion, that is, an appreciable or substantial contributing cause. Susnik v. Oliver Iron Min. Co. *supra*. See, also, Menarde v. Philadelphia Transp. Co. 376 Pa. 497, 103 A. (2d) 681.

In a well-considered workmen's compensation case, Purity Biscuit Co. v. Industrial Comm. 115 Utah 1, 4, 201 P. (2d) 961, 962, the Supreme Court of Utah sustained an award to an employee for a disc protrusion on the following testimony by the employee's physician:

"* * * He said that it was possible that 'a little forward tilting of the body, a little bending of the back and a little manipulation of the legs would bring a sudden protrusion of a previously damaged disc, or a previously diseased disc,' but that would not be the original primary cause. He further testified that 75% of such cases are preceded by an injury to the back which the patient recalls, * * * but *'there may be a lot of months or years before a complete protrusion' and disablement occurs, that some times these previous injuries may be trivial but still cause or be a contributing factor in producing a later damaged or diseased condition."* (Italics supplied.)

In 1 Larson, Workmen's Compensation Law, § 39.10, the author, in discussing gradual-injury decisions, says:

"* * * [M]ost jurisdictions have at some time awarded compensation for conditions that have developed, not instantaneously, but gradually over periods ranging from a few hours to several decades, cul-

minating in disability from * * * back injury, * * * herniated disc and the like."

In Golob v. Buckingham Hotel, 244 Minn. 301, 304, 69 N. W. (2d) 636, 639, where medical experts took opposite positions with respect to causality, we said:

"* * * [U]ntil the time comes when medical knowledge has progressed to such a point that experts in the field of medicine can agree, causal relation in determining compensable injury or disease will have to remain in the province of the trier of fact. Where qualified medical witnesses differ as they do here, it ordinarily is not for us on appeal to say that one is so eminently right and the other so clearly wrong that the fact finder was obliged to accept the opinion of one and discard the opinion of the other. The determination of this question is like the determination of any other question of fact, and it must depend to a large extent upon the credibility attached by the trier of facts to the opinion and testimony of the various witnesses who are expressing their opinions."[5]

In the instant case, however, there does not appear to be any real conflict between the testimony of Dr. Titrud and Dr. Buchstein.

The testimony set forth earlier in this opinion establishes that Dr. Titrud took the positive position that the 1940 fall initiated the chain of events which eventually resulted in relator's disability and that, while Dr. Buchstein was not willing to ascribe relator's disc difficulty entirely to the 1940 fall, he did not deny that the 1940 fall was a substantial contributing cause. His position is perhaps best revealed by the following question and answer which arose during direct examination by the employer's counsel:

"Q. From the fact that there was a 16-year interval from the time of the 1940 incident to the time of the surgery and apparently the time when the difficulties arose, would it not be a fair inference to say that the trauma of everyday life caused the disc rather than an isolated incident some 16 years back?

---

[5]See, also, Haskin v. County of Hennepin, 268 Minn. 21, 127 N. W. (2d) 522.

"A. Well, I would perhaps restate this a little bit by saying it would appear to me unreasonable to attribute the cause of this situation to an isolated trauma 16 years previously. I'm thinking now of this—in trying to think of this in legal rather than medical terms, in which one is trying to attribute this situation to a specific incident, and if this is what we're trying to do, then it would appear unreasonable to me to choose this incident 16 years earlier."

Here Dr. Buchstein refused to assert that relator's disability was due solely to degenerative processes incident to normal wear and tear just as he was unwilling to say that relator's disability was due solely to the 1940 fall. Moreover, his answer reveals an erroneous assumption on his part that "legal cause" means "sole cause." Thus, the import of his answer to this particular question, as well as his whole testimony, becomes clear. His opinion is simply that no single incident was the sole cause of the disc protrusion—that many factors undoubtedly contributed to it, including the 1940 fall which he had stated in a letter to the employer, "subjected [relator's] neck to a considerable stretch and strain at that time."

Thus, though Dr. Buchstein disagreed with Dr. Titrud as to whether relator's disability is entirely attributable to the accident in 1940, it appears to us that they were in agreement with respect to the real question in issue: Did the fall in 1940 appreciably or substantially contribute to relator's eventual disability? That it did is supported by their expert opinions as well as by relator's medical history. Most significant is the fact that relator experienced difficulty with his left foot almost immediately after the 1940 fall and this condition persisted until the onset and progressive worsening of other difficulties. Nothing can be more enlightening relative to the early difficulties he encountered physically, following the fall and the severe injuries received in 1940, than the report of the Army medical board discussed *supra*.

It is clear from the foregoing discussion that we find nothing in the evidence presented before the commission to justify its finding that there was no causal relationship between the injury sustained by relator in the 1940 accident and his present condition. Since the evidence in this case legally requires findings in favor of relator, the decision of

the commission is reversed and the proceeding remanded with directions to award to him the compensation allowed by the statute for such disability as he has actually sustained.

Attorney's fee of $300 is allowed to relator.

Reversed and remanded.