## MABEL S. STENBERG v. RAYMOND CO-OPERATIVE CREAMERY AND ANOTHER.[1]

February 7, 1941.

No. 32,635.

[1]Reported in 296 N. W. 498.

*Reynolds & McLeod,* for relators.
*Gleason, Ward & Orff* and *R. W. Dygert,* for respondent.

JULIUS J. OLSON, JUSTICE.

*Certiorari* to review an order of the industrial commission awarding compensation to the widow of Fred Stenberg, an employe of relator-employer.

Stenberg's employment is conceded, also that he was engaged in the performance of his usual work within and upon his employer's premises when he fell and struck his head against a projecting leg of an adding machine in the creamery's office. The challenged and vital finding reads:

"That on or about October 31, 1938, said employe sustained an accidental injury arising out of and in the course of his employment resulting fatally on the same date."

One member of the commission dissented, saying that there were two questions involved: (1) Whether the employe "died as result of a head injury sustained in his employment or from heart failure, and (2) whether the head injury 'arose out of' his employment." As to the first, he deemed it "clearly a question of fact"; as to the second, that it presented only "a question of law." Thus we have unanimity of opinion that whether Stenberg died as the "result of a head injury sustained in his employment or from heart failure" presented purely a fact issue.

Consideration of the really difficult problem here presented requires a resumé of the facts, especially as to whether Stenberg's injury and resulting death arose "out of" his employment.

Some 23 years prior to the fatal day, Stenberg had suffered a severe injury to one of his knees so that thereafter he walked with a limp. At times the "knee would lock on him and give him

a lot of pain." In such circumstances he would "always go to sit down and take both hands and press the knee * * * and seem to get it back in position."

During the forenoon of October 31, one Judstrup brought a can of cream to the creamery. Stenberg weighed it and emptied the cream. He seemed to be all right. Taking a small sample of the cream for testing, he proceeded to the creamery office, a few feet distant. "Just before he started * * * I saw him bend over and put his hand onto his knee. He seemed to me to be dazed * * * until he toppled over. * * * after coming in a few feet he fell forward striking the corner of the typewriter stand, with his head just about the left eye. He then struck the floor smack on his face." Unconsciousness followed immediately, and he "started to bleed from the mouth." The family doctor was called, and Stenberg was carried on a stretcher to his home near-by. The doctor administered hypodermic injections intended to relieve what was then thought to be a heart attack. Stenberg had theretofore been treated by the doctor for high blood pressure. But death followed within 25 minutes after his fall. An autopsy was held that afternoon, performed by the family doctor and county coroner. They found that Stenberg had suffered "a comminuted fracture" at the base of his skull which had caused a rupture of the middle meningeal artery at the point where it enters the cranial cavity, "and thereby the hemorrhage and death resulted." There was free blood in the dural sac estimated at 300 c. c.

Stenberg's body was embalmed and promptly buried. Some two months later, at relators' request, the body was exhumed and another autopsy held. Relators' specialists made exhaustive findings based thereon. The so-called "diagnoses" are thus stated:

"Coronary sclerosis and thrombosis with infarction of the myocardium; post-mortem fracture of the skull and on the basis of the size of the heart and the changes in the kidneys, that the man had suffered from a primary hypertension."

Their testimony supports these "diagnoses."

But Dr. Barron, testifying in rebuttal for respondent, said that he did not think these constituted "sufficient evidence" to overcome the findings made at the first autopsy. The embalming and cleaning of the body preparatory to burial, he said, "considerably changed" the situation, since "there is always a chance of getting some of the blood washed off and filling in with certain solutions that they use." In addition, as the second autopsy was held some two months after the first, "that again gives a chance for the material they use to fill in the cranium to so obliterate the small amount of blood that could escape" from the fracture as to be "very easily overlooked, and I doubt if I would use that as a base as to an ante-mortem or post-mortem fracture in this case." He also deemed it "not only possible but probable" that 300 c. c. of blood were found at the first autopsy in decedent's skull as an accumulation caused by the ante-mortem fracture. He assigned additional reasons for concurring in the views of the two doctors who performed that autopsy. He testified that the usual thing for a patient suffering a heart attack is to complain "at once about the distress that he has from * * * the pains in his chest. * * * When a patient has a heart attack he will complain of pain over the precordium, the chest." He deemed "it more reasonable to assume that the fall" resulting in a fractured skull "with a hemorrhage of the brain, was the cause of death and not" the heart condition found at the time of the second autopsy. He considered it to be "humanly impossible" to "squeeze out" by manipulation "300 c. c. of blood" within a few hours after death. Therefore, he concluded, the ante-mortem bleeding was what caused death, and the post-mortem fracture referred to in the report of the second autopsy could not have caused this accumulation. The post-mortem fracture referred to was that caused at the time of the first autopsy, when, because of inadequate sawing of decedent's skull, a chisel was used to break it open.

Over a considerable period of time Stenberg had been suffering with high blood pressure. He was a man of corpulent build,

weight about 190 pounds, age 57 years. His family doctor testified, however, that while on several occasions he had caused a test to be made of Stenberg's blood pressure, the highest reading "would be about 180 or 185, and that was over [normal] about 100 to 105 \* \* \* I wouldn't call that really high blood pressure \* \* \* it isn't excessive or unusually alarming." And a few minutes after the fatal fall the doctor found his pulse to be "a good, strong, regular pulse."

If the accident was one "arising out of and in the course of the employment" compensation was rightly awarded. If, on the other hand, as claimed by relators, "there was no accident arising out of the employment" and "was not occasioned" by it, "and the injury resulting from the fall was not occasioned by a hazard of the employment," then their contention of nonliability should be sustained.

■ From the facts recited we think that the commission was justified in finding that the accident occurred while Stenberg was "in the course" of his employment, and was not caused by heart failure.

■ Nor would Stenberg's weak heart or tricky knee, as such, relieve his employer from liability even though these defects left him more susceptible to injury than would have been the case if he were in perfect physical trim.

"If an unforeseen accident to an employe, while engaged in the performance of his work, directly causes an injury to the physical structure of his body, the injury is compensable \* \* \* even though the employe had a natural weakness predisposing him to such an injury." Wilkins v. Ben's Home Oil Co. 166 Minn. 41, 207 N. W. 183.

■ The defective knee was but a contributing factor as a prelude to the fall, but the fall itself is what caused death, not the tricky knee or weak heart. So, if the fatal accident "arose out of" the employment, we would then have the combination of an injury "arising out of and in the course" of the employment.

The term "arising out of" the employment points to the origin or cause of injury. Larke v. John Hancock Mut. L. Ins. Co. 90 Conn. 303, 309, 97 A. 320, L. R. A. 1916E, 584. The question, then, is whether the accident was caused by risks in the conditions of his employment, and that again resolves itself into a determination of whether the fall or the weak knee and defective heart caused the injury. And that raises the problem of finding the proximate cause. Proximate cause is lucidly and accurately defined in Monroe v. Hartford St. Ry. Co. 76 Conn. 201, 207, 56 A. 498, 501, as follows:

"When an event is followed in natural sequence by a result it is adapted to produce, or aid in producing, that result is a consequence of the event, and the event is the cause of the result."

Applying the test as thus defined to the facts here appearing, we think it lay within the province of the triers of fact to find and determine, as they did, that the fall was the proximate cause of decedent's death.

"The fall * * * was the event, and it was followed by his injury which the fall was adapted to produce. * * * Whether his physical condition had been idiopathic, or due to his own fault, or to something that had occurred while he was outside the course of his employment, if by reason of it he fell and injured himself, the proximate cause of the injury in each case was the fall, * * * The inference, although unexpressed, seems to us plain that if he had fallen because of a physical disability which he had brought to his employment, * * * the resulting injury would have been one arising out of the employment. And this would have been so because the fall would have caused the injury and not the physical disability." Gonier v. Chase Companies, Inc. 97 Conn. 46, 50, 51, 115 A. 677, 678, 19 A. L. R. 83.

Cf. Savage v. St. Aeden's Church, 122 Conn. 343, 189 A. 599; In re Connelly v. Samaritan Hospital, 259 N. Y. 137, 181 N. E. 76; Corcoran v. Teamsters & Chauffeurs Joint Council, 209 Minn. 289, 297 N. W. 4; State ex rel. Simmers v. District Court, 137 Minn.

372

318, 320, 163 N. W. 667; Dunnigan v. Clinton Falls Nursery Co. 155 Minn. 286, 289, 193 N. W. 466, and cases cited.

■ We conclude that the commission also was justified in its finding that "the fall sustained by Stenberg in the course of his employment, * * * happened suddenly and resulted in a fracture at the base of the skull when he struck an iron stand or the concrete floor, both of which were instrumentalities of the employment."

Viewing the accident "after the event," we think that it appears "to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." Novack v. Montgomery Ward & Co. 158 Minn. 495, 499, 198 N. W. 290, 292.

Respondent is allowed $100 attorneys' fees in addition to statutory costs and disbursements.

Writ discharged and order affirmed.

HILTON, JUSTICE (dissenting).

It may be conceded that Stenberg's fall, occurring during the "course" of his employment, was the immediate, primary, even proximate, cause of death. This, however, does not answer the question whether the fall was occasioned by any risk or condition created by the employment. As the phrase "out of the employment" has been used and understood in our previous decisions, after the event it must be possible to see that the injury which resulted did result because of some risk peculiar to the employment and not common to the neighborhood. The Gonier case, 97 Conn. 46, 115 A. 677, 680, 19 A. L. R. 83, upon which heavy reliance is placed by the majority, states, at page 54, that "the danger of falling and the liability of resulting injury was a risk arising out of the conditions of his employment" (painting in high places). Nothing in Stenberg's employment subjected him to a risk of falling. The Corcoran case, 209 Minn. 289, 298, 297 N. W. 4, represents no departure from our traditional view. It was there said that before an injury arises out of the employment "it is necessary that the injury flow naturally from a hazard or special

risk connected with the employment." The question there was not whether there were risks in the employment subjecting Corcoran to danger of death at the hands of an assailant, but it was a question of fact whether his death was in fact caused by those risks. The problem here is different. Only if the fall in question was induced by a risk of the employment was the resulting injury compensable. To my mind, there is nothing in the evidence justifying an inference that the fall was the product of some risk of injury created by the employment. Rather it was the result wholly of the physical condition of the employe at that time.

STONE, JUSTICE (dissenting).

I concur in the opinion of Mr. Justice Hilton.

