178 So.2d 106 (1965)
Norman C. HASTINGS (Deceased) Ethel Hastings, Widow, Petitioner,
v.
CITY OF FORT LAUDERDALE FIRE DEPARTMENT and Florida Industrial Commission, Respondents.
No. 33406.
Supreme Court of Florida.
June 30, 1965.
Rehearing Denied September 20, 1965.
Minnet, Allsworth, Doumar, Schuler & Elliott and James F. Minnet, Fort Lauderdale, for petitioner.
*107 Charles Desmond Crowley, Fort Lauderdale, Patrick H. Mears, Tallahassee, and J. Franklin Garner, Lakeland, for respondents.
HOBSON, Justice (Ret.).
Norman C. Hastings was forty-five years of age when he died as a result of a heart attack. He was employed at the time by the Fire Department of the City of Fort Lauderdale, Florida. His employment had been continuous for thirteen years, the past eleven years of said period of employment he served as an engineer-driver.
On the day Mr. Hastings suffered the fatal heart attack, he was engaged with others in a supervised large fire drill. Those employees, including Hastings, who participated in this drill, which simulated necessary activities attendant upon a large fire, were observed and graded upon their respective degrees of proficiency.
Near the end of this drill Hastings was found lying along side the fire truck. No one saw him fall but the circumstances indicated that he had fallen from the cab of the fire truck while engaged in backing the truck and holding open the left door in order to lean out and look back to see where he was going. Another driver-engineer by the name of Grant found Hastings at about 11:30 A.M. Mr. Hastings was immediately taken to the hospital where he was pronounced dead on arrival at 12:00 noon.
The primary question in this Workmen's Compensation case is whether the Full Commission erred in reversing the award entered by the Deputy, upon the premises that there is in the record no competent, substantial evidence to sustain the Deputy Commissioner's findings of facts and "that his Order does not accord with the law as set forth in Victor Wine & Liquor, Inc. v. Beasley, Fla. 1962, 141 So.2d 581."
The decision of the Full Commission was not unanimous. It was what is commonly referred to as a 2-1 decision. The majority merely stated "there is no competent substantial evidence to sustain the voluminous findings of fact and recitation of evidence of the deputy commissioner; and that his Order does not accord with the law as set forth in Victor Wine & Liquor, Inc. v. Beasley, Fla. 1962, 141 So.2d 581." The dissenting member of the Commission expressed a contrary view. It was his opinion that the Deputy's Order is both comprehensive and lucid and is sustained by competent substantial evidence. After a careful and studious examination of the record, we are convinced that the position taken by the dissenting member of the Commission is correct.
Dr. Cooper is the only cardiologist who testified. He has specialized in cardiology since 1948. The Deputy found and stated that Dr. Cooper "had propounded to him an agreed upon hypothetical question." We will not give a detailed resume of Dr. Cooper's testimony. Suffice it to say he was of the opinion that Mr. Hastings' death was accelerated by, and that it was causally related to, the work that he was doing on the date of his death. The patently qualified cardiologist stated that the causal relation, predicated upon the amount of stress, physical, emotional and mental, which preceded his death, accelerated deceased's death 100 per cent.
At this point, we deem it appropriate to state that the autopsy disclosed the fact that Mr. Hastings' heart had old scar tissue which all doctors agreed was evidence of prior myocardial infarctions. There was no evidence of any "young scarring" or of any "fresh coronary". Mr. Hastings never complained of any pain or other symptoms indicative of a myocardial infarction at any time and his family physician was not aware that he had suffered myocardial infarctions in the past until after the autopsy report. It is obvious that Mr. Hastings' previous myocardial infarctions were of the type which are customarily classified by the medical profession as "silent."
*108 Dr. Cooper, in explaining why he was of the opinion that the unusual physical effort and mental stress and strain exerted and experienced by decedent immediately prior to his attack accelerated his death 100 per cent, said: "I don't see how you can apportion it. To my mind, I don't care how really severe the anatomical changes are, up to a certain degree. In this particular instance, he had a significant coronary artery disease, as I gather of all coronary vessels, and he had evidence of scarring, he even had evidence of diminishing of the wall due to lack of muscle tissue, but there is no way to predict whether he will, arbitrarily, survive for 30 or 40 years, or whether he will not, based on this disease. We have people who have evidence of involvement of all their arteries at various times who are still having excess pain under certain circumstances, and they will still work and nothing of a major consequence, and certainly not death, has occurred." In response to the question, "* * * is there any way that you can apportion  " Dr. Cooper said: "I can't see how in this case. It looks like he is all or none. He was fully performing his duties up to the morning of the death and as far as I understand your question, there weren't any symptoms. And here at 12:00, he's dead. And I don't see how you can apportion  it is either 100 per cent or nothing here. If I get your question correctly, I don't see how you can apportion that."
We are cognizant of the fact that in Victor Wine and Liquor, Inc. v. Beasley, Fla., 141 So.2d 581, after quoting Section 440.02 (19), Fla. Stat.F.S.A., we stated: "In heart attack cases where the claimant is entitled to compensation, this statute excludes any recovery for disability attributable in fact to the pre-existing condition and limits recovery solely to injury from the aggravation. * * *". In that case, the claimant "sought workmen's compensation for a disability diagnosed as a coronary occlusion." We were not faced at that time with the question which is presented here: What should a Deputy Commissioner do when there is competent, substantial evidence presented to him to the effect that the deceased employee died as the result of "ventricular fibrillation" or "arrhythmia" super induced by unusual physical and mental stress and strain not common to his routine duties, rather than a myocardial infarction and that it is impossible to apportion the award by attributing a certain percentage to the pre-existing disease and another percentage to the acceleration of death "reasonably attributable to the accident" ?
We are of the opinion that the Deputy was correct, in the light of all the evidence, in awarding 100 per cent for the aggravation or acceleration of death "attributable to the accident" and 0 per cent to the pre-existing disease of which both he and his family physician were unaware and which up to the date of his death had not incapacitated him. This Court in Lyng v. Rao et al., Fla., 72 So.2d 53, pronounced the rule "Even if the cause was doubtful it would be our duty under the law and the basic philosophy of Workmen's Compensation Acts to resolve such doubt in favor of the claimant."
In support of his statement that absent unusual physical effort or mental stress and strain Mr. Hastings might have lived even beyond the Biblical allotted time of three-score years and ten, Dr. Cooper explained that which is certainly known to the medical profession and to laymen who have concerned themselves with the subject that when there is clotting or filling up of a coronary artery nature ofttimes creates a collateral circulation which picks "up the job that this * * * coronary artery was supposed to do; * * *."
It is important at this juncture to observe that the record leads to the inescapable conclusion that Mr. Hastings did not die as the result of a myocardial infarction.[1] *109 The evidence leaves little or no doubt but that the decedent met his death by virtue of "ventricular fibrillation or arrhythmia." Although Dr. Ferayorni disagreed with Dr. Cooper, in that he did not see any causal relationship between the decedent's physical effort and mental stress and strain and his death, he admitted that emotional stress or strain does play a role in producing a fibrillation. This doctor, an internist, further testified as follows:
"Q. But you also know, do you not, that some event or something caused this death; didn't it, Doctor?
"A. Well, I 
"Q. Didn't you say fibrillation?
"A. Fibrillation is usually  the usual mode of death. I don't know whether it did or not. But that is what I would assume happened.
"Q. Is it significant to you, Doctor, that there was no fresh clotting of blood?
"A. In  only insofar as he didn't have a fresh coronary.
"Q. You don't know whether he had a coronary then, do you?
"A. He didn't have a coronary, a fresh one. He had an old one.
"Q. But the old one he lived with, didn't he?
"A. Yes."
We quote this portion of Dr. Ferayorni's testimony for the purpose only of demonstrating that it is not entirely contradictory of that given by Dr. Cooper but, actually, to some degree, supports the opinion expressed by this expert in the field of cardiology upon the subjects of causal relationship and of immediate cause of death, to wit: "ventricular fibrillation or arrhythmia" rather than a myocardial infarction.
The testimony of lay witnesses (mainly fellow firemen) discloses that the regular or "routine" duties of the decedent on his 24-hour stint (48 hours off between stints) were cleaning up around the fire station, sweeping out, preparing his own coffee and meals, cleaning and polishing the fire truck and seeing to it that said truck was at all times in good running condition. Said testimony also shows that the large fire drill which took place just prior to his death was normally a monthly drill, but that it did not take place every month. On this point Dr. Cooper stated:
"If this is a grading drill or rating drill, I would think that given the amount of coronary artery disease that he had and the amount of unusual or excessive, or more than his regular work, at least it sounds like 28 days out of the month he didn't do this much work, that is sufficient cause for him to have the coronary. Or even the  if he fell out of this truck and had a sudden strain,  that this is enough to precipitate something at that moment which might not occur the day before or the day after."
The testimony to the effect that Mr. Hastings engaged in unusual physical work and was under abnormal stress and strain just prior to his death was admittedly controverted. It was not, however, the duty of, nor is it appropriate for, the Full Commission or this Court to re-weigh or re-evaluate the testimony. Both bodies should examine the record and determine only if the findings of facts and the compensation order entered by the Deputy are sustained by competent, substantial evidence.
*110 While we are on this subject of the "substantial evidence" rule, we deem it advisable to observe that one question posed and argued by counsel on both sides of this controversy is improper and will not be answered.[2] It is: "Whether or not the Deputy Commissioner erred in relying on the testimony of Dr. Cooper and in rejecting the testimony of Dr. Haugen and Dr. Ferayorni?" We do not attribute an ulterior motive to counsel, but were we to consider and expressly answer this question we would set a precedent for repudiation of the rule which this Court advisedly pronounced in United States Casualty Company v. Maryland Casualty Company, 55 So.2d 741. For the sake of emphasis, we restate and reaffirm the subject rule: "* * * the deputy commissioner's findings of facts should be upheld unless there is no competent, substantial evidence, which accords with logic and reason, to sustain them." In that same case we expressed the opinion that the "`substantial evidence' rule should be invoked in all cases. Even in cases which must be resolved upon a true appraisal of testimony of medical experts, * * *."
In connection with the questions which we have thus far discussed we hold that the findings of fact made by the Deputy are sustained by competent, substantial evidence which accords with logic and reason.
Two other points are presented: First, the question whether or not the widow is entitled to funeral benefits since the award made by the Deputy failed to set forth the exact amount of funeral benefits that the carrier should pay, and secondly, the query whether the fee of $4,250 is excessive.
The statute provides that funeral expenses not to exceed $500 may be allowed. Consequently we do not find reversable error because the carrier can secure a statement or receipted bill for funeral expenses and if it should be that such expenses were in excess of $500, the carrier would not be obligated to pay more than that sum.
With reference to the allowance of a fee of $4,250, to claimant's attorney, we can only say that the respondents have failed to demonstrate that such allowance is grossly excessive. Moreover, counsel stipulated that the Deputy Commissioner could fix the attorney's fee without testimony or affidavits. We can not find from this record that he abused his discretion.
The decision and order of the Full Commission assailed herein is hereby quashed with directions that the compensation order entered by the Deputy Commissioner be reinstated.
It is so ordered.
DREW, C.J., and THORNAL and ERVIN, JJ., concur.
CALDWELL, J., dissents with Opinion.
CALDWELL, Justice (dissenting).
The vital question in this case is whether the deceased was "subject to unusual strain or over-exertion not routine to the type of work he was accustomed to performing"[1] by virtue of his participation in a monthly fire drill. The majority opinion upholds the deputy's legal conclusion that such a drill did place the employee under "abnormal stress and strain" and I disagree. It is my conviction that if any phase of the fireman's duty may be considered normal and free from the unusual it is the practice drill periodically held for the purpose of training the fireman to perform his usual duty of controlling fires. We have, in other decisions, chipped away at the corners of *111 the Victor Wine rule[2] but this opinion, for all practical purposes, recedes.
Also, I must disagree with the majority opinion in its holding that even though a pre-existing disease admittedly accelerates death, the deputy need not apportion the award if he finds that apportionment would be difficult or "impossible," when, as in this case, claimant's heart disease had not incapacitated him prior to his death. In conflict is the opinion of Mr. Justice Hobson in the Henderson case,[3] wherein it was held:
"Notwithstanding the fact that petitioner's disease was dormant at the time of his injury, it is apparent from the evidence that the pre-existing disease and the compensable accident merged to produce the disabling injury. In such a case the employer is entitled to assert the benefits of Section 440.02(19), F.S.A., even though it may be difficult to determine the amount of aggravation and acceleration of disability. See United Electric Company v. Myers, Fla., 134 So.2d 7. We have noted that the deputy based his failure to apportion in part on the provisions of Section 440.15(5) (c) holding that the claimant was not, prior to his last injury, disabled, and that therefore the provisions of Section 440.15(5) (c) were not applicable. This same argument was advanced and rejected in the recent case of Murray v. City of St. Petersburg, Fla., 138 So.2d 319 * *."
In the Murray case[4] this Court, in an opinion by Mr. Justice Thomas, stated:
"The deputy then indulged in some reasoning which we have difficulty following. He drew the conclusion that although the claimant was handicapped before being employed, he was not incapacitated because he did actually work for the city for six years and that this capacity to earn, which eclipsed his former disability, was wholly destroyed by breathing dust and smoke from the rubbish heap. * * * The deputy applied this in such a way that once the claimant began work he was not disabled despite his obvious condition, and when he ceased to be employed by the city he was 100% disabled. * * * The conclusion was, therefore, that inasmuch as the claimant started with a disability of zero and ended with a disability of 100%, apportion was `unnecessary as well as impossible.'

"We pose a rhetorical question: If a worker, simply because he gets a job, has for that reason no disability whatever, when would there ever be a situation calling for apportionment?" (Emphasis supplied)
The Myers case,[5] an opinion by Mr. Justice O'Connell, held the award of full death benefits error where the work-connected injury merely accelerated death:
"This Court has previously committed itself to the rule that apportionment *112 should be made where a disability results from an injury which aggravates a pre-existing non-disabling disease or condition. * * *
"The statute and these cases clearly require apportionment when the aggravation of the pre-existing disease or condition causes acceleration of death as in this case.
"Admittedly under the evidence found in this case it may be difficult to determine to what extent death was accelerated by the injury. Nevertheless, it must be done and it must be done by the deputy on evidence presented to him at a hearing. * * *"
Mr. Justice Thornal in the Hampton case,[6] a heart attack case, held:
"We realize that we are dealing with fact situations, which at times will be difficult to prove. However, the rule which we have announced involves no greater difficulties than one which depends on speculation as to the life expectancy of a particular employee suffering from a chronic cardiac ailment. We are also satisfied that the apportionment formula which we have prescribed is the one contemplated by the legislative mandate contained in Section 440.02(19), supra."
In the cause under consideration the deputy, on conflicting medical evidence, found that the employee's death was causally related to his activity during the fire drill; that all four doctors agreed the employee had severe pre-existing coronary arteriosclerosis, had suffered previous coronary infarctions and probably died of ventricular fibrillation; that prior to claimant's fatal attack his right coronary artery was 100% occluded and the left coronary artery 95% occluded. Two doctors were of the opinion death could have been accelerated 5%, a third doctor testified 10% at most, by exertion during the fire drill.
Florida Statute § 440.02(19), F.S.A., provides in part:
"Where a pre-existing disease is accelerated or aggravated by accident arising out of and in the course of the employment, only acceleration of death or the acceleration or aggravation of disability reasonably attributable to the accident shall be compensable."
The deputy nebulously explained his failure to apportion in this manner:
"The medical profession has been reluctant to speculate relation between trauma and death. Medical science has insisted on the distorted speculation because of the absence of explanatory medical mechanism to help explain the pathological process which relates trauma to disease. If a gap existed between certain facts and recognized pathological processes a medical opinion related to it is then justified. Thus, while many things occur, medical science has been reluctant to relate trauma to disease. Admittedly there are degrees of probability which have depended upon the acceptance of certain facts. Physicians who testify understand and appreciate the difference between what is probable and that which is possible."
The deputy concluded that, although pre-existing disease contributed to death, apportionment was unnecessary because it was difficult or speculative. He ignored record evidence by three medical experts supporting apportionment in definite percentages and ignored the clear language of Victor Wine:[7]
"In heart attack cases where the claimant is entitled to compensation, this statute [Fla. Stat. § 440.02(19), F.S.A.] excludes any recovery for disability attributable in fact to the pre-existing condition and limits recovery solely to injury from the aggravation. * * *113 and it requires apportionment of an award of compensation for a disabling heart attack suffered during the course of employment and resulting from work-connected exertion."
I dissent because the fire drill was perfectly normal and usual phase of the deceased's duty and, second, because the award, if any, should have been apportioned. I would affirm the Full Commission.
NOTES
[1] The testimony of expert witnesses in this case, as well as that in the other heart attack cases which have come to this Court, establishes rather conclusively the fact that a person might suffer a myocardial infarct while sitting calmly in his living room, resting or sleeping in his own bed. This conclusion is not entirely empirical. Although there is lack of unanimity upon the subject, it appears that a majority of modern cardiologists leans toward the view that "ventricular fibrillation or arrhythmia" is triggered by some degree of physical or emotional stress or strain however slight.
[2] Unless it might be said that such question is indirectly answered when we determine the query whether the Deputy's findings and compensation order are sustained by competent, substantial evidence which accords with logic and reason.
[1] Victor Wine & Liquor, Inc. v. Beasley, 141 So.2d 581, 588 (Fla. 1962).
[2] Ibid.: "Facing the precise problem at hand wherein the claimant's activity of picking up and stacking heavy cases of wine was found to have contributed substantially to the precipitating or bringing on of an acute heart condition by accentuating the normal progress of the pre-existing arteriosclerosis, we adopt the following rule for heart cases: When disabling heart attacks are involved and where such heart conditions are precipitated by work-connected exertion affecting a pre-existing non-disabling heart disease, said injuries are compensable only if the employee was at the time subject to unusual strain or over-exertion not routine to the type of work he was accustomed to performing." (Emphasis supplied.)
[3] Henderson v. Sol Walker & Co., 138 So.2d 323, 327 (Fla. 1962).
[4] Murray v. City of St. Petersburg, 138 So.2d 319, 321 (Fla. 1962).
[5] United Electric Co. v. Myers, 134 So.2d 7, 10 (Fla. 1961).
[6] Hampton v. Owens-Illinois Glass Co., 140 So.2d 868, 870 (Fla. 1962).
[7] Victor Wine & Liquor, Inc. v. Beasley, 141 So.2d 581, 589 (Fla. 1962).