## LOUIS DUDOVITZ v. SHOPPERS CITY, INC., AND ANOTHER.

164 N. W. (2d) 873.

January 31, 1969—No. 40771.

*Gerald B. Forrette* and *Joseph Harkness, Jr.,* for relator.

*Scholle, Schweiger & Kalina* and *Leslie C. Scholle,* for respondents.

KNUTSON, CHIEF JUSTICE.

Certiorari to review a decision of the Industrial Commission denying compensation to an employee who suffered a heart attack while on the job.

The only question before us is whether the evidence sustains the commission's finding that there was no causal relationship between the heart attack and the employment.

The facts pertinent to our inquiry may be briefly summarized: Louis Dudovitz, the relator, was born on July 17, 1908, and was 56 years of age at the time of the hearing before the Industrial Commission. He was a high school graduate. For over 40 years he had been employed as a produce buyer for various food markets in the St. Paul area. On July 31, 1963, he was employed as a supervisory employee and produce department manager for Shoppers City, Inc., a large supermarket. He normally worked 10 to 12 hours daily in supervision of produce department operations, which included buying produce and arranging it on counters where it was offered to the public for sale. He normally commenced his

work about 4:30 a. m. in order to be at the produce market in time to purchase the required produce. He normally worked until 5 or 6 p. m. each day.

On July 31, 1963, Shoppers City was having an advertised sale of early-season corn at reduced prices. In order to obtain the corn required for the sale, Mr. Dudovitz went to the market, where he supervised the purchase of some 3,000 dozen ears of corn. His work required that he sometimes climb up on the trucks, open sacks of vegetables, and make inspection of the various vegetables he was to purchase. He had done the same type of work for years. He did not recall having to load any of the corn or any other produce purchased on that day into the station wagon used to transport it to Shoppers City. Usually this was done by some-one else. After he arrived at the store, he did not carry any corn from the cooler to the display counter, but was in the act of lifting a crate of celery, which weighed from 50 to 60 pounds, when he developed severe pain in the upper chest area, began to sweat profusely, and had to stop work. He was hospitalized by his family doctor, and there is no dispute that at the time involved he suffered a coronary occlusion with sub-sequent posterior myocardial infarction.

Prior to July 31, 1963, Mr. Dudovitz had received no medical treat-ment for heart trouble although he had been hospitalized on a number of occasions for unrelated illnesses. Most of these involved nervous dis-orders for which he had received shock treatment and other therapy.

The referee found that the employee sustained a personal injury in the nature of a myocardial infarction which arose out of and in the course of his employment. On appeal, the Industrial Commission reversed by unanimous decision, finding that there was no causal relationship between the myocardial infarction and the employment.

The doctor who attended relator shortly after the heart attack did not testify, as he also had become disabled as the result of a heart attack.

Relator called Dr. Markle Karlen, a specialist in internal medicine, who stated that in his opinion there was a causal relationship between the heart attack and the employment. The employer called Dr. Dean K. Rizer, who also specializes in internal medicine. He was of the opposite opinion, stating that in his opinion there was no causal relationship between the

heart attack and the employment. Both doctors agree on the diagnosis stated above. They differ only as to causal relationship, or, in other words, what precipitated the heart attack. No one questions the qualifications of either doctor, and it is apparent that they based their opinions on their own honest judgment as to what brought about the coronary occlusion and resulting myocardial infarction.

This case is no different from the numerous cases that have come before us in which medical opinions differ on whether there is a causal relationship between an occurrence which causes an employee disability or death, such as a heart attack or the onslaught of a disabling disease, and his employment. In these cases we have held that it is for the triers of fact to say which opinion is right, and if there is credible evidence upon which they base their finding we have consistently held that we are bound by it. The cases are collected in 21 Dunnell, Dig. (3 ed.) § 10426(13), note 16. We have repeated this rule so often that it is trite to repeat it again, and a review of our cases can serve no useful purpose except, perchance, to discourage useless appeals in this area when there is competent and credible evidence from which the factfinder might draw inferences either way, since we have so often held that we are bound by the determination of the commission.

In Schultz v. U. S. Bedding Co. 210 Minn. 68, 69, 297 N. W. 351, 352, we said:

"As is customary in such circumstances, the losing party makes much of alleged inconsistencies, claimed defects, lack of proof, etc., on the part of his opponent, the prevailing party before the triers of fact. But that, perhaps, is the kind of error for the correction of which no remedy has yet been found.

\* \* \* \* \*

"With ample evidence to sustain the commission's findings, we are bound thereby, since we do not try the facts nor determine the credibility of the testimony of witnesses, *be they laymen or medical experts*." (Italics supplied.)

In Saari v. Dunwoody Iron Min. Co. 221 Minn. 95, 96, 21 N. W. (2d) 94, 95, we said:

"We have often said that where the evidence is in conflict the findings of the industrial commission, if reasonably supported, are conclusive on review by this court. [Citations omitted.] And that, also, is the rule to apply where there is conflict in medical testimony. Like other testimony, the fact issue is to be resolved by the triers of fact."

In the Saari case we quoted from Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 326, 8 N. W. (2d) 24, 25, as follows:

"* * * Conflicts in medical opinions, like those in other testimony, must be resolved by the triers of fact. Here there was a direct conflict on the vital issue in the case between the view of employe's doctor and the view of the doctors who testified for the employer. The commission accepted the testimony of Dr. Hengstler and awarded compensation. Under our oft-repeated rule, we cannot go beyond its determination."

It is for the triers of fact to choose between conflicting evidence and also between conflicting inferences to be drawn therefrom. Hill v. Umbehocker, 201 Minn. 569, 277 N. W. 9.

The burden of proof is upon the employee to prove his claim by competent testimony. Schmillen v. Dave Schroeder Grocery, 250 Minn. 561, 566, 85 N. W. (2d) 740, 743. In that case, again, we said:

"* * * We have held repeatedly in workmen's compensation cases that conflicts in medical opinion must be resolved by the triers of fact. We think the conflict in the instant case raises a fact issue concerning employee's physical condition and its cause, which was for decision by the Industrial Commission.

"* * * Triers of fact in workmen's compensation proceedings must in determining their findings choose not only between conflicting evidence but also between opposed inferences."

Haskin v. County of Hennepin, 268 Minn. 21, 127 N. W. (2d) 522, involved the contraction of tuberculosis. In such cases, also, we often find a difference in medical testimony, but the same rule applies. We there said (268 Minn. 24, 127 N. W. [2d] 525):

"* * * Determination of this question [the causal relationship between the contraction of the disease and the employment], of necessity, must

rest largely on the acceptance of one of two divergent opinions of doctors experienced in this field. No one can demonstrate beyond dispute which of these two possibilities caused the active tuberculosis. The necessary inference to be drawn must be based on the factfinder's belief that the opinion of one doctor is more credible and more probable than the other."

In Peterson v. The Ruberoid Co. 261 Minn. 497, 500, 113 N. W. (2d) 85, 87, as in many other cases, we recognized the impossibility of determining beyond any question the precipitating cause of a coronary thrombosis:

"It is, of course, difficult to establish the precipitating causes of coronary thrombosis. The determination of whether the employment was a causal factor in producing the attack must necessarily rest upon competent medical testimony, and, where there is a conflict, the finding of the commission will not be disturbed on appeal."

The same rule is stated in Golob v. Buckingham Hotel, 244 Minn. 301, 304, 69 N. W. (2d) 636, 639, also involving a coronary thrombosis. We there said:

"* * * [U]ntil the time comes when medical knowledge has progressed to such a point that experts in the field of medicine can agree, causal relation in determining compensable injury or disease will have to remain in the province of the trier of fact. Where qualified medical witnesses differ as they do here, it ordinarily is not for us on appeal to say that one is so eminently right and the other so clearly wrong that the fact finder was obliged to accept the opinion of one and discard the opinion of the other. The determination of this question is like the determination of any other question of fact, and it must depend to a large extent upon the credibility attached by the trier of facts to the opinion and testimony of the various witnesses who are expressing their opinions."

For other cases of interest, see Schroepfer v. Hudson, 214 Minn. 17, 7 N. W. (2d) 336; Nelson v. Creamery Package Mfg. Co. 215 Minn. 25, 9 N. W. (2d) 320; Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118; Root v. City of Duluth, 247 Minn. 243, 76 N. W. (2d)

698; Olson v. F. I. Crane Lbr. Co. 259 Minn. 248, 107 N. W. (2d) 223; Luthens v. Glencoe Red & White Store, 264 Minn. 26, 117 N. W. (2d) 386; Hommerding v. Clarence Landwehr Heavy Moving, 273 Minn. 40, 139 N. W. (2d) 482; Knaeble v. Custom Tool & Mfg. Co. 273 Minn. 515, 142 N. W. (2d) 92; Stibbs v. Northwest Airlines, Inc. 277 Minn. 248, 152 N. W. (2d) 318.

It is only when the evidence is so conclusive that only one inference is permissible that this court on review may interfere with the finding of the Industrial Commission. This rule is particularly applicable to cases involving causal relationship between a heart attack of one kind or another and the employment. Here, probably more than anywhere else, it is next to impossible to determine causal relationship with any degree of certainty, and the factfinder's choice between permissible inferences must be based on the credibility of the medical experts in the case as applied to the other evidence in the case. And when they have divergent views it is not for us to say which was right. Dr. Karlen, who testified for relator, admitted that "the majority of so-called heart attacks occur either at rest or during no activity or mild activity." With respect to the certainty of diagnosis of precipitating cause of heart attacks, he said:

"Well, in no case can we if you want to get—I mean technically in no case can you say the same as you can say with respect to pneumonia that the cause of pneumonia is a bacterium pneumococcus; and a myocardial infarction you can say that the basic cause is coronary arteriosclerosis, but in no case can you say, sit down and say 100 percent sure that this man had the attack because he smokes too much; that's one of the factors, but you have no 100 percent cause if that's what you are asking, but that is true in any case in heart trouble not in just some cases as you alluded to."

He admitted that there are honest differences of opinion as to whether work activity may precipitate a heart attack.

Dr. Rizer, who testified for the employer, while admitting that there are two schools of thought on the subject, contended that the majority of the medical people in this field feel there is no relationship between the work of an individual and the onslaught of a coronary occlusion. He

stated that it is due to a gradual change in the blood vessels, which finally reach a point where they do not carry a sufficient supply of blood to the heart, and that this may occur at any time. His testimony was as follows, without any qualification:

"Q. Your opinion as to the type of heart condition that he had and its cause and its possible relationship to work?

"A. Well, it appeared to be a perfectly straightforward coronary occlusion and posterior myocardial infarction. This represents a complication of arteriosclerotic and atherosclerotic heart disease. *In terms of present day medical knowledge the exact cause of arteriosclerosis and atherosclerosis is unknown.* However, there is a background of inheritance in this condition. It is also known that hypertension, diabetes, obesity and a diet high in saturated fats which is the standard American diet, and cigarette smoking all seem to be background factors of acceleration in this condition. *It is known that hard physical work doesn't cause arteriosclerosis and atherosclerosis. Quite to the contrary, it appears to have a beneficial effect on the course of the disease.* For example, farmers who maintain close to a normal weight tend to have their coronaries as a group about ten years later than their more sedentary urban workers. Mr. Dudovitz led an active and vigorous life. He was accustomed according to his work record to handling and moving and lifting sacks and baskets of produce weighing up to 50 pounds. The work that he did on the day in question, while heavy, was in no way unusual for him. *To me, this indicates that an internal change must have occurred to produce his coronary rather than attributing it to external factors which had been fairly constant through his working life.*

"Q. Well, what then, Doctor, would you state as your opinion with respect to causation between the work that he was doing for his employer at the time and the onset of this heart symptom?

"A. *In my opinion this coronary is not work related.*" (Italics supplied.)

No one questions the doctors' qualifications in their field of medicine. Their opposite views are undoubtedly based upon an honest difference of opinion. It was for the Industrial Commission as the trier of fact to choose which opinion, based on all the evidence in the case, was entitled

to the greater credit. Under these circumstances there is nothing we can do but affirm.

Some suggestion has been made that where the opinions of medical experts, apparently equally well-qualified, differ as to causal relationship between the onset of a heart attack or some other disease and employment, a neutral physician should be called by the Industrial Commission, as it may do under our statutes. Neither party urges this as a solution in the present case. It is obvious that the difficulty with this suggestion in an area where there are two schools of thought among medical people—as, in this case, over whether exertion or trauma may be the precipitating cause of a heart attack—is that the outcome might depend on the school of thought adhered to by the neutral physician. If a really neutral physician could be found it might be of some help; but it is doubtful that in this area, where the opinions of medical men seem to be so definite either one way or the other, such could be found. The Industrial Commission is not bound by the opinion of a neutral physician any more than it is bound by the opinion of any other doctor, Richter v. Shoppe Plumbing & Heating Co. 257 Minn. 108, 100 N. W. (2d) 96; and while there are cases where a neutral physician might be highly desirable, we doubt that this is one of them.

Affirmed.

NELSON, JUSTICE (dissenting).

I respectfully dissent from the conclusions reached in the majority opinion on the issue of employer liability.

It does not appear to be necessary to give a full recital of the facts surrounding the accident and injury here involved. I feel, however, that it is necessary to state that the employee-relator worked as a supervisory employee and produce department manager for Shoppers City, Inc., normally working 10 to 12 hours daily in the supervision of the produce department operations. He had been thus employed for a period of 40 years for various food markets in the St. Paul area.

Respondent employer operated one of the largest produce department sections in St. Paul. Relator's normal day's work would commence at

4 a. m. and continue until 5 or 6 p. m. On July 31, 1963, relator arrived at the produce market at 4:30 a. m. to begin making the necessary purchases. In order to inspect the produce before making purchases, he had to climb up on trucks and move crates and their contents around. The corn which was to be a specialty on the day in question was delivered in 40- to 50-pound sacks and relator had to move these around and open them in order to examine the contents. He finished his purchasing by 7:15 a. m. on that day. The produce, having been loaded in a station wagon and truck, was delivered to respondent employer's produce department at 7:45 a. m.

When the produce arrived, relator was required to immediately begin setting up the produce department. This required the carrying of crates to the various coolers and display counters. At about 10:30 a. m. relator was arranging the celery on the display counters and was in the act of lifting a 50- to 60-pound crate of celery to an elevation topping other crates already in place when he suddenly felt a sharp pain in his chest which forced him to sit down. He became warm and began perspiring profusely. He went to a back room and sat down where he rested about 20 minutes. Not feeling any better, he went home and called his family doctor. He went to the doctor's office that afternoon, still experiencing the same pain he had suffered in lifting the celery crate. He was examined by his doctor and sent to St. Luke's Hospital that evening, where he was confined continuously for a period of 1½ months.

While relator had had several prior hospitalizations for illnesses over the past 25 years, there was none among these relating to a heart condition. However, there appears to be no question but that he suffered a coronary occlusion with subsequent posterior myocardial infarction at the time of lifting the celery crate. Relator filed a claim petition and at a hearing before a referee of the Industrial Commission three doctors testified. His family physician, Dr. B. J. Singer, who attended him at the time he was hospitalized, was unable to appear and testify due to having suffered a heart attack himself.

Dr. Clarence Rowe was called to testify concerning relator's emotional condition following the heart attack, Dr. Singer having arranged for Dr.

Rowe to provide special treatment for relator over a period of some 10 days.

Dr. Markle Karlen, a specialist in internal medicine, testified that he felt that the demands of relator's work were strenuous enough on the day in question to cause an insufficiency in the posterior portion of relator's heart and the subsequent infarction. Dr. Karlen concluded that, while there were other factors which also precipitated the heart attack, there was a definite causal relation between it and the work relator was doing when it occurred.

Dr. Karlen's conclusions were based on the facts of this case. He testified:

"* * * I base it [his medical opinion] on the work that was described to me. Whether it was usual or unusual, I do not feel is the paramount point in question. To me the paramount question is was the work that was described sufficient in my opinion to bring about an insufficiency of the coronary circulation. Now whether that is usual or unusual is not the paramount point. For example, in a situation that is much more clear cut a man may be engaged in lifting 200 pound barrels all day long and be doing it for years and nothing happens, but on one particular day he lifts this barrel and gets an acute back strain. The fact that he had been doing it previously does not change my opinion that that was the precipitating episode * * *."

In Dr. Karlen's opinion, relator had suffered 15-percent damage to his heart.

Dr. Dean K. Rizer, a specialist in internal medicine with 25 years' experience, appeared for respondents. He stated that he examined relator on March 30, 1963, and that he took a history from him; that he examined him for the purpose of appearing and testifying in these proceedings; but that he had never actually treated relator.

*Dr. Rizer concurred in the diagnosis of Dr. Karlen as follows*:

"* * * Arteriosclerotic heart disease, coronary occlusion, posterior myocardial infarction, by history, 31 July, 1963. Second diagnosis.

Neuropsychiatric disease manifested by anxiety and depression with good response to shock therapy and recovery."

However, Dr. Rizer indicated that in his opinion relator's heavy work was his usual work and therefore his employment could not be considered a precipitating cause of the coronary occlusion and infarction.

Dr. Rizer was questioned about the effect of relator's work on the day he was stricken:

"Q. So, in other words, Doctor, your opinion would be different if this was considered unusual work for the man on the day—

"A. If it was extremely heavy and severe to the point where he had to run the equivalent of a block put it that way.

"Q. How much lifting is extreme and severe in your opinion?

"A. It would have to be extreme lifting.

"Q. How much?

"A. I couldn't tell you exactly.

"Q. Well, give us some idea?

"A. *Well, I don't think that I have—that I have ever seen a coronary precipitated by lifting so I can't give you an exact answer on that.*" (Italics supplied.)

On recross-examination, Dr. Rizer testified as follows:

"Q. In other words, he had a pre-disposition, Doctor, is that correct?

"A. I think so.

"Q. And this coronary aggravated that pre-disposition?

"A. Exactly."

Dr. Rizer simply testified that in his opinion relator's coronary was not work-related. He was asked:

"Q. But would you recommend that he try to do heavy lifting?

"A. Well, the reason that we don't do this always comes up for question by someone. * * * Now I like to give a man a full year on a fairly icey [sic] pattern of activity before he begins to test himself * * *. * * * [W]ith a normal sized heart, a heart which hasn't been stressed, perhaps he can do a great deal more than he is doing right now. I don't know but I think it's up to the individual to test himself out on this and take

it slowly. For the moment my advice to him if he were my patient would be *'Don't do your heavy work; go back to this gradually and see what you tolerate.'* " (Italics supplied.)

Dr. Rizer did, however, agree that the electrocardiogram which Dr. Karlen had taken was consistent with a healed posterior infarct of indeterminate age and admitted that he did not conduct an exercise test during his physical examination of relator because of the fear that this exertion and exercise might affect relator's heart. He also frankly acknowledged that his medical philosophy was based upon the now-discredited "unusual exertion" rule.

The Minnesota court has never had any difficulty in accepting the fact that aggravation of an existing heart condition by work-related activity is compensable despite the fact that such work would not injure a healthy heart. Kemling v. Armour & Co. 222 Minn. 397, 24 N. W. (2d) 842. In Babich v. Oliver Iron Min. Co. 157 Minn. 122, 127, 195 N. W. 784, 786, 202 N. W. 904, we stated:

"* * * If there is a causal connection between the work the employe is doing and the sudden and violent rupture, break or tear in the physical structure of his body, the injury comes within the definition of accidental even though there is nothing extraordinary occurring in or about the work itself * * *."

However, prior to 1953, the court did distinguish between "usual" and "unusual" work. If the work which preceded the heart attack did not constitute unusual exertion, then no compensation was allowed. Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636. This approach was capable of producing rather unusual results. If the heart attack was caused by exertion which was "unusual," no matter how slight that exertion might be, it was compensable. However, if the attack was caused by exertion which was "usual" or customary for the employee, no matter how strenuous it might be, no compensation was allowed.

In 1953 the Minnesota Legislature amended the Workmen's Compensation Act and removed the words "caused by accident." L. 1953, c. 755, § 2, Minn. St. 176.021. The Minnesota court then abandoned the "unu-

sual exertion" rule which was based on the use of the word "accident." Fleischer v. State Dept. of Highways, 247 Minn. 396, 77 N. W. (2d) 288.

It is clear that the idiosyncracies of the "unusual exertion" rule warranted its abandonment, but it is equally clear that the elimination of that doctrine did not resolve the problem of establishing causation in heart-attack claims. The conflict still lingers on. The difficulty is that the heart attack can occur in the natural course of events from factors totally unrelated to the employee's work.

However, the question in the instant case is whether the facts set out in the record would justify a finding that the occurrence of the employee's heart attack, *which definitely took place while he was lifting one of several 50- to 60-pound crates on the morning in question,* was totally unrelated to his work. The record is clear that the attack came simultaneously with the lifting of one of those crates and, whether the exertion applied was unusual or merely usual, he nevertheless became incapacitated from that moment on. What dependable evidence offered by medical experts or otherwise, if any, has been produced in this record to the effect that the lifting of the 50- to 60-pound crate in question was not a contributing cause? Is the finding of the Industrial Commission thus supported by the undisputed facts set forth in the record?

It is only necessary that the employment expose the employee to the hazard in some way peculiar to the employment so that he does not stand in relation thereto the same as the public generally. See, Lickfett v. Jorgenson, 179 Minn. 321, 323, 229 N. W. 138, and cases cited in support of that holding.

In our resolution of the conflict, the first premise is that the mere fact that an employee suffers a heart attack at his usual place of employment during his usual working hours is not of itself sufficient to warrant recovery and that the employee has the burden of demonstrating causal connection between his employment and the heart attack. Kolflat v. Northern Ordnance Co. 274 Minn. 104, 142 N. W. (2d) 588.

Secondly, our court has delineated certain guidelines to determine when the employment and the heart attack are causally connected. In Peterson v. The Ruberoid Co. 261 Minn. 497, 113 N. W. (2d) 85, we upheld

a finding that the employee's fatal heart attack was causally connected to his employment as a loader and unloader of hopper railroad cars. The court held that in order for the employee to establish causal connection (261 Minn. 499, 113 N. W. [2d] 86):

"* * * [I]t must be shown that the heart attack was brought on by strain or overexertion incident to the employment, *even though the exertion or strain need not be unusual or other than that occurring in the normal course of the employment*." (Italics supplied.)

In Stibbs v. Northwest Airlines, Inc. 277 Minn. 248, 152 N. W. (2d) 318, the court upheld a finding of no causal connection in the face of conflicting medical testimony on whether the stress of removing and replacing decals on planes was sufficient to cause the heart attack or whether the attack was merely the natural result of a degenerative heart condition. The court held that the final test in determining causation is whether the work was "a contributing cause." 277 Minn. 252, 152 N. W. (2d) 322.

It appears, then, that the test to be applied can be stated as follows: *In order to carry the burden of showing causal connection, the employee must show that the work that he was doing produced some stress or exertion, not necessarily unusual, which was a contributing cause of the heart attack, although it need not be the primary cause.* Relator has met this test.

The test applied by the Industrial Commission was that the work must have been a "significant" factor in the heart attack. Based on the holding in the Stibbs case, this test is erroneous. As long as the work plays any part in causing the heart attack, it is compensable.

In Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878, we held that a severe heart attack on the part of a fireman, due to overwork and the strain placed upon a previously disabled heart, was compensable. In Walker v. Minnesota Steel Co. 167 Minn. 475, 476, 209 N. W. 635, 636, this court said:

"The compensation act was designed for the protection of all laborers coming within its purview. That is, it does not apply to those only who

are strong in body. Neither is it limited to those only who are normal. Those who are below normal, have a weakness or a disease, are also within its protection. Compensation is not dependent upon any implied assumption of perfect health. It does not exclude the weak or physically unfortunate. * * *

* * * * *

"An actual aggravation of an existing infirmity caused by an accident in the course of employment is compensable, even though the accident would have caused no injury to a normal person."

In 2 Larson, Workmen's Compensation Law, § 59.20, the author states:

"* * * Nothing is better established in compensation law than the rule that, *when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable* * * *." (Italics supplied.)

In Stenberg v. Raymond Co-op. Creamery, 209 Minn. 366, 296 N. W. 498, it was stated that if an unforeseen accident to an employee occurring while he is engaged in the performance of his work directly causes an injury to the physical structure of his body, the injury is compensable *even though the employee had a natural weakness predisposing him to such an injury, provided the accident was one arising out of and in the course of his employment.* The Workmen's Compensation Act makes no distinction between those who are physically perfect and those who have some structural weakness making them liable to injury from some unexpected, sudden accident.

The claim for compensation in the instant case depends upon whether relator's heart condition, of which he had no knowledge, was aggravated while he was performing his duties and thus arose out of and in the course of his employment. The facts surrounding the sudden heart attack are indisputable, presenting simple questions of fact, the answers to which support a finding that relator's injury was indeed compensable. There was no evidence contra. This court has disturbed findings of fact made by the commission when it has found that they were made upon an erroneous theory concerning the proof of injury, as in Wilkins v.

Ben's Home Oil Co. 166 Minn. 41, 207 N. W. 183, or when contrary to a conclusion demanded by all the evidence, as in Frederickson v. Burns Lbr. Co. 163 Minn. 394, 204 N. W. 161.

In Klika v. Independent School Dist. No. 79, 161 Minn. 461, 464, 202 N. W. 30, 31, Mr. Justice Dibell said:

"The finding of the commission, if there is evidence reasonably tending to sustain it, is binding upon the court. * * *

*"But if there is a misapprehension or misapplication of the law there may be a remand for a rehearing."* (Italics supplied.)

I think the record herein undisputedly establishes that relator had been engaged in arduous work, subject to strain, whether usual or unusual, from 4:30 a. m. until 10:15 a. m. on the same morning, when he was stricken with the heart attack.

In Kvernstoen v. Nelson, 212 Minn. 102, 2 N. W. (2d) 560, we said that a recovery cannot rest merely on speculation and conjecture, *but if the proof furnishes reasonable basis for an inference that the injury was the cause of employee's ailment it is sufficient.* We also held in that case that *where legal cause and its harmful effects have been shown by competent evidence liability follows, although other causes may have lent their aid.*

In Hastings v. City of Fort Lauderdale Fire Dept. (Fla.) 178 So. (2d) 106, the decision of the commission was quashed with directions that the compensation ordered by the deputy commissioner be reinstated. In Woodbury v. Arata Fruit Co. 64 Idaho 227, 239, 130 P. (2d) 870, 875, the Idaho court held:

"The rule is well established in this jurisdiction that injury, *resulting partly from accident and partly from a pre-existing disease, is compensable if the accident aggravated or accelerated the ultimate result;* and it is immaterial that the claimant would, even if the accident had not occurred, become totally disabled by reason of the disease." (Italics supplied.)

In the Woodbury case the order of the board denying compensation to the employee was ordered set aside and the cause remanded with di-

rections to the board to make an award in favor of the employee. See, also, 1 Larson, Workmen's Compensation Law, § 12.20, and cases cited.

In Jacobs v. Village of Buhl, 199 Minn. 572, 273 N. W. 245, this court held that even though an employee is afflicted with a disease which would eventually result in his death, that fact does not bar his dependents from the right to recover for his death if he suffered an accident which arose out of and in the course of his employment, and this is so, *even if such accident intensified or aggravated his condition or affliction,* provided the accident was a contributing cause of his death. The court in the Jacobs case also stated (199 Minn. 587, 273 N. W. 252):

"Having in mind those well settled rules of law, it must follow in a case like the one before us that when an injury occurs to an employe suffering from a disease which renders the employe more susceptible to serious consequences from injury, and where death follows in close sequence without the proof developing any other active exciting cause for the sudden onset of the serious conditions, the fact-finding body should find that the injury caused his death."

In this case it is clear from the testimony of Dr. Rizer, considered in its entirety, that he obviously premised his opinion on the discovery after the work-related incident occurred that relator was at the time afflicted with atherosclerosis and that there were indications of a degeneration of blood vessels, which finally occluded, causing his heart attack. He expressed his opinion, never having theretofore treated or examined relator, that the heart condition which had developed suddenly while lifting was wholly unrelated to relator's work. Dr. Rizer thus limited the cause to the normal progress of the disease only, ignoring the statutory abandonment of the "unusual exertion" rule which had heretofore been based on the word "accident."

While the claimant has the burden of establishing a causal connection between the employment and the disability, he must only show that the heart attack was brought on by strain or overexertion incident to the employment. Such strain or exertion need not be unusual or other than that occurring in the normal course of his employment. Kolflat v. Northern Ordnance Co. *supra.*

The failure of Dr. Singer to appear as a witness presents a missing link in the evidentiary chain. Under the circumstances, the commission might well have designated a neutral physician of good standing and ability to make an examination of the injured worker and report his findings to the commission as provided for under Minn. St. 176.155, subd. 2. This, however, was not done.

Generally speaking, the Industrial Commission is free to accept any medical opinion which has reasonable support in the evidence and which appears to it as trier of fact to be reasonable. The rule is well established, however, that the value of an expert opinion is dependent on and entitled to no more weight than the facts used as a foundation therefor, and unless the basis of such opinion is supported by proper facts, it is without probative value. See, Johnson v. Munsell, 170 Neb. 749, 104 N. W. (2d) 314. See, also, Oviatt v. Oviatt Dairy, Inc. 80 S. D. 83, 95, 119 N. W. (2d) 649, 655, wherein the court stated:

"Expert testimony is no stronger than the facts upon which it is predicated. Mark v. Industrial Acc. Comm., 29 Cal. App. 2d 495, 500, 84 P. 2d 1071; Blankenfeld v. Industrial Acc. Comm., 36 Cal. App. 2d 690, 98 P. 2d 584. In these cases, the rule stated in Winthrop v. State Industrial Acc. Comm., 213 Cal. 351 at p. 354, 2 P. 2d 142 at p. 144, is cited:

" 'The case does not present a true conflict of evidence. The opinions of the doctors who were of the view that the fall did not produce the twisting of the pedicle, as stated in their letter reports, were based on the theory that severe symptoms did not appear until some time after the fall. The evidence, on the other hand, shows the petitioner suffered severe abdominal pains almost immediately thereafter, although her condition naturally became aggravated as time elapsed. Said opinions, being based on a state of facts not shown by the record to exist, are not in conflict with the opinions of the doctors whose statements were based on the facts actually shown to exist by the evidence of petitioner and the doctors who attended her.' "

In this case, I am unable to find any basis in the record which permits or justifies the acceptance of the expert medical opinion of respondents' doctor, in the form presented, in preference to the expert

medical opinion presented by relator. The medical testimony, as it stood before the referee and before the commission, required the adoption of the findings of the referee, it being undisputed that the incident herein arose out of and in the course of relator's employment.

It is at all times proper to remind ourselves that the Workmen's Compensation Act is highly remedial and should not be construed so as to exclude any employee from the benefits thereof unless it clearly appears that he does not come within the protection of the act. This court has repeatedly said that the act should be liberally construed in favor of the employee. The Workmen's Compensation Act was legislatively devised to provide protection to workmen in the form of compensation for injuries arising from hazards having reasonable relation to their employment and which follow as a natural incident of their work. The purpose of the act was to shift the burden of providing compensation for accidental injuries sustained during employment from the individual workman to the industry itself without requiring the employee to prove fault or negligence on the part of the employer. See, Moore v. J. A. McNulty Co. 171 Minn. 75, 213 N. W. 546; Kiley v. Sward-Kemp Drug Co. 214 Minn. 548, 9 N. W. (2d) 237; Moschogianis v. Concrete Material & Mfg. Co. 179 Minn. 177, 228 N. W. 607.

I recognize the weight that should be given to the commission's findings of fact. However, there was nothing inherently improbable in the evidence in the instant case. The undisputed evidence forces me to conclude that the decision of the commission was wrong. Positive, undisputed testimony of unimpeached, competent, and credible witnesses cannot be disregarded unless it is improbable or inconsistent and a reasonable ground for disregarding it appears in the record.

Minn. St. 176.481 provides:

"On review upon certiorari under this chapter, the supreme court has original jurisdiction. It may reverse, affirm, or modify the order allowing or disallowing compensation and enter such judgment as it deems just and proper. Where necessary the supreme court may remand the cause to the commission for a new hearing or for further proceedings with such directions as the court deems proper."

In commenting upon the scope of review under a former, substantially identical statute, this court in Larson v. Le Mere, 220 Minn. 25, 28, 18 N. W. (2d) 696, 699, stated:

"* * * The word *original* in the above statute [Minn. St. 1941, § 176.62 (Mason St. 1927, § 4321)] did not and could not enlarge the jurisdiction of this court beyond its appellate jurisdiction (and such original jurisdiction in *remedial* cases as prescribed by law) conferred and limited by Minn. Const. art. 6, § 2. Lading v. City of Duluth, 153 Minn. 464, 190 N. W. 981. The word, however, is not without meaning. In using the word *original*, the legislature obviously intended to emphasize that this court should have jurisdiction to review the entire proceedings below from their very origin or inception as to any issue raised by an assignment of error * * *."

See, also, Benson v. Hygienic Artificial Ice Co. 198 Minn. 250, 269 N. W. 460.

In the Benson case we affirmed an order of the Industrial Commission denying compensation to the relator. The commission had found that the injuries claimed to have been received by him as an employee of the ice company did not arise out of and in the course of his employment. Our affirmance was based on our holding that, as a matter of law on the evidence presented, the relator was not an employee of the respondent company. We added (198 Minn. 254, 269 N. W. 462):

"It may be claimed that question was not raised by the relator on *certiorari*. It is, however, raised by respondents in their brief and argument. By the statute, 1 Mason Minn. St. 1927, § 4321, this court is granted original jurisdiction in these cases and 'may reverse, affirm or modify the award or order of disallowance reviewed and enter such judgment as may be just and proper; and where necessary, may remand the cause to the Industrial Commission for a new hearing or for further proceedings, with such directions as the court may deem proper.'

"Findings of fact by the industrial commission will not be disturbed unless consideration of the evidence and permissible inferences therefrom clearly require contrary conclusions. Here there is no dispute as to

the character and kind of service performed or as to the relation of the relator to the respondent company, and it becomes our duty to declare what law governs as to whether relator was an employe within the workmen's compensation law."

In Kennedy v. Thompson Lbr. Co. 223 Minn. 277, 281, 26 N. W. (2d) 459, 461, we said:

"* * * [I]n compensation cases, where the evidence leads to only one conclusion and it is considered that the parties ought not to be put to the expense and delay of another trial, the cause may be remanded with directions to make findings in accordance with the undisputed evidence and to enter a conclusion upon the findings consistent with the opinion of this court. O'Rourke v. Percy Vittum Co. 166 Minn. 251, 207 N. W. 636."

There the undisputed, unimpeached testimony, which was not inherently improbable nor discredited by any facts or circumstances in the case, required a finding that relator suffered an accidental injury. Babich v. Oliver Iron Min. Co. 157 Minn. 122, 195 N. W. 784, 202 N. W. 904.

Ordinarily this court will not disturb the commission's findings unless it is clear that reasonable evidence is lacking to sustain them. It appears to me from a careful review of the record herein that it establishes beyond question, and as a matter of law, that there was a causal connection between relator's employment, the exertions he put forth throughout the morning in question, and the resulting injury.

It is not enough that there was medical testimony on both sides to circumscribe the decision arrived at by the commission as one based only on fact determination. The duty of this court is not ordinarily performed without examining the evidence to ascertain whether it has substance to support a decision one way or the other. That is simply the exercise of an appellate judicial function. Roman v. Minneapolis St. Ry. Co. 268 Minn. 367, 377, 129 N. W. (2d) 550, 557. In the case at bar there is compelling evidence to hold that the medical testimony upon which it appears the commission chose to rely does not support its decision.

It is my conclusion, based on the evidence presented, that relator was clearly entitled to findings in his favor.

The decision of the commission ought to be reversed with directions that the compensation award ordered by the referee be reinstated.

MURPHY, JUSTICE (dissenting).

I concur in the dissenting opinion of Mr. Justice Nelson.

SHERAN, JUSTICE (dissenting).

I concur in the dissenting opinion of Mr. Justice Nelson.