Debby McIalwain AHOE, Respondent,

v.

QUALITY PARK PRODUCTS, et al., Relators.

No. 46490.

Supreme Court of Minnesota.

Oct. 7, 1977.

Laurence F. Koll, St. Paul, for relators.

Sigal & Savelkoul and Richard A. Miller, Minneapolis, for respondent.

KELLY, Justice.

Relators, Quality Park Products and its compensation insurer, seek review of a decision of the Workers' Compensation Board (now the Worker's Compensation Court of Appeals) awarding respondent employee benefits for temporary total and temporary partial disability. Relators contend that a prior award which terminated benefits for temporary total disability is res judicata as to employee's claim of continuing temporary total disability and that she is not entitled to compensation because she voluntarily terminated her employment in September 1974; that she has demonstrated ability to work full time and therefore is not entitled to an award for temporary

partial disability benefits; and that the award of permanent partial disability benefits precludes an award of temporary benefits for the same disability. We affirm.

Employee's work experience has been almost exclusively operation of machines which make envelopes.[1] On January 11, 1972, the machine she was operating jammed. In turning the machine off, employee jerked her back and felt immediate pain in the lower part of it. She was intermittently off work from January 14, 1972, until November 13, 1973. Employee filed a claim petition September 14, 1973, seeking compensation for temporary total and permanent partial disability. In March 1974 she was awarded medical expenses and benefits for 33⅔ weeks of temporary total disability. On November 14, 1973, employee had obtained light sedentary work for another employer, so she was found not to be temporarily totally or partially disabled as of that date. The question of permanent partial disability was not determined.

Employee quit the sedentary job in January 1974 because of pregnancy. Her child was born March 29, 1974, and on June 10 she returned to work for Quality Park, operating a clasp machine on the first shift. In August she requested a transfer to the second shift because her husband had been transferred to a day shift. Work on a clasp machine or one of the other smaller machines was not available on the second shift, and employee was assigned a medium operating machine. The work required her to lift boxes from the floor, and she found that doing so made her back sore and stiff. She quit work September 6, 1974, and said she did so because other employees would not lift the boxes for her. Quality Park's plant superintendent thought her termination was voluntary.

In October 1974 employee worked for another envelope manufacturer, Mackay Envelope Company, for 7 days but quit because she was unable physically to run a large operating machine, the only available job. She then began work at Lakeland Envelope Company on an "as needed" basis. She has been operating a lighter machine, does no lifting, and is allowed to take breaks when her back becomes tired from standing. She has not had regular full-time employment but felt she could work full time at Lakeland in spite of a constant dull backache.

In July 1974, relators gave employee notice of discontinuance of benefits as of May 1, 1974. After objection and answer, employee filed a second claim petition seeking benefits for intermittent temporary total disability from September 5, 1974, and for permanent partial disability. The medical evidence presented at this compensation proceeding may be summarized briefly: Dr. James D. Kramer, an orthopedic surgeon who treated her between July 27 and October 29, 1973, thought employee had a herniated disc at the L5 to S1 level and that her back had improved after rest and conservative treatment. Dr. Robert Wengler, an orthopedic surgeon who testified for employee, thought she had a disc prolapse. Dr. Lloyd Leider, an orthopedic surgeon who testified for relators, diagnosed her problems as obesity and chronic low back pain syndrome. Employee's permanent partial disability of the spine was evaluated by Dr. Kramer as 5 percent; by Dr. Wengler as 30 percent, and by Dr. Leider as 10 percent. Dr. Leider attributed some of the disability he found to causes unrelated to the injury employee had sustained in January 1972. Dr. Kramer and Dr. Wengler thought employee should be restricted from work requiring heavy or repetitive lifting, prolonged standing or sitting, and much bending. Dr. Wengler thought she could do work like that she had done at Lakeland.

1. Quality Park and other envelope manufacturers use six machines: The small, medium, and large operating machines, and the clasp, international, and rotary machines. On each, the operator loads stock into a feeder and picks up and packs the folded envelopes as they come out of the machine. The machines differ mainly in the size and weight of the stock each uses. Employee was trained to operate all machines, but most often ran the large operating machine before her injury. She has been unable to operate the medium and large operating machines in her present condition.

On the foregoing evidence the compensation judge awarded employee compensation for a 15-percent permanent partial disability of the spine, and for temporary partial and temporary total disability at various times since October 1974. He ordered her to report to the Division of Vocational Rehabilitation for determination of the feasibility of retraining. The Workers' Compensation Board affirmed and adopted this decision.

1. Relators claim that the first award of temporary total disability benefits precludes the second one in the absence of proof that employee's physical condition changed. This contention ignores the fact that the concept of temporary total disability "is primarily dependent upon the employee's ability to find and hold a job, not his physical condition." *Schulte v. C. H. Peterson Construction Co.*, 278 Minn. 79, 83, 153 N.W.2d 130, 134 (1967). In the decision under review, the award of temporary total disability was for those weeks when employee did not work at Lakeland. Although she felt she could work 40 hours a week at Lakeland, on the record before it, the compensation court could find that, except for a job under the unusually favorable conditions she found at Lakeland, employee's physical disability would prevent her from successfully working at the jobs now available for which she has had training. Quality Park's plant superintendent testified that, even if employee had not left her job on the clasp machine in August 1974, she would have been laid off for lack of seniority early in 1975 when Quality Park was forced to lay off a large number of employees because of poor business conditions. In view of employee's limited experience, the changed job market, and her physical disability, the finding that she had been temporarily totally disabled during the weeks Lakeland did not need her services has evidentiary support. It is not precluded by the earlier award, which was entered in proceedings which did not pass upon her ability to obtain employment in the future.

2. Relators contend that employee is not entitled to temporary disability benefits because she left a job she could do in August 1974 for work which she could not perform because of her disability. Courts have come to different conclusions on the effect of an employee's voluntarily leaving a job he is capable of performing. Relators rely on two Rhode Island cases in which the court denied compensation to employees who, for reasons unrelated to their injuries, left work they could perform. In *Pearl v. Builders Iron Foundry*, 73 R.I. 304, 55 A.2d 282 (1947), the employee had resumed his original job and performed it for a few months before quitting to find other work. The court upheld a decree denying compensation, holding that the evidence sustained a finding that employee had failed to prove he was unable to perform the job he had left or that his earning capacity had been diminished. In *Ucci v. Hathaway Bakeries, Inc.*, 75 R.I. 341, 66 A.2d 433 (1949), the employee had returned to his job as a route supervisor and performed it for several months. He was demoted for misconduct to the job of driver-salesman and quit, claiming his disability prevented him from doing that kind of work. The court upheld the dismissal of employee's compensation petition, holding that the evidence sustained the finding that he was not incapacitated from performing the duties of a supervisor. The court added that the employer had had no duty to offer him other work following the misconduct which brought about the demotion.

On the other hand, some courts have sustained awards of compensation to employees who voluntarily left work offered them by their employers, and then found that, because of their disability, they could only perform jobs paying lower wages. In *Bajdek's Case*, 321 Mass. 325, 73 N.E.2d 253 (1947), the Massachusetts Supreme Court refused to hold that an employee's change of jobs precluded a compensation award as a matter of law and said that the issue was whether there was an impairment of earning capacity. A similar view was taken by the court in *P. P. G. Industries, Inc. v. Workmen's Compensation Appeal Bd.*, 7 Pa. Cmwlth. 588, 300 A.2d 902 (1973). There, an employee who suffered a back injury

was given a lighter job at lesser pay, but left it to enter the ministry. He could not support his family as a full-time minister and sought other employment, but found none because he could perform only light work due to his injury. The court affirmed a compensation award, holding that the employee's loss of earnings was the result of his disability rather than a result of his quitting his employment. The court said that the legislature did not intend that an injured employee should be barred from compensation when he had quit his employment for reasons which were unrelated to a purpose to effect a resumption of compensation payments. See, also, *Workmen's Compensation Appeal Bd. v. John W. Galbreath & Co.*, 20 Pa.Cmwlth. 283, 341 A.2d 541 (1975).

The rule enunciated in the Rhode Island cases has been criticized because in effect it would require an employee to cling to the same job forever. See, 2 Larson, Workmen's Compensation Law, § 57.64. The approach of the Massachusetts and Pennsylvania courts is preferable in light of the purpose of workers' compensation laws to compensate a disabled worker for impairment of earning capacity.

In the present case, as in *Bajdek's Case, supra,* employee did not resume her original duties when she returned to work in June 1974. Although she had usually operated the large operating machine before her injury, she returned to work on the clasp machine, which was easier work. When she was transferred to the medium operating machine in August, she found that the lifting required in operating that machine was too difficult because of her back condition. She had no ulterior motives in asking for the transfer. We conclude that she should not be barred from receiving benefits because she left the work she was capable of doing and attempted work which proved too difficult because of her disability.

3. Relators contend that the finding that employee has been intermittently temporarily totally or temporarily partially disabled is not warranted by the evidence. They claim that employee's work record for Lakeland and her own testimony, as well as that of the doctors, establish that she can work full time. The medical testimony, however, permits the inference that she is probably unable to perform sustained continued labor on a full-time basis in a job similar to the one she had held. It is reasonable to infer that the unusually favorable working conditions employee found at Lakeland were not typical of the industry. Moreover, employee had difficulty operating heavier machines both at Quality Park and at Mackay. If the evidence is viewed in the light most favorable to the finding, we cannot say that the finding is manifestly contrary to the evidence or that consideration of the evidence and the inferences permissible therefrom would clearly require reasonable minds to adopt a different conclusion. Accordingly, the finding has sufficient evidentiary support. *Grgurich v. Sears, Roebuck & Co.*, 301 Minn. 291, 223 N.W.2d 120 (1974).

4. Relators, having paid the benefits awarded employee for a 15-percent permanent partial disability of the spine, argue that these benefits preclude her from also receiving temporary partial disability benefits. They rely on *LeMieux v. Mortenson*, 306 Minn. 50, 234 N.W.2d 897 (1975), which held that an employee who had resumed full-time work and then had withdrawn from the labor market to become self-employed was not entitled to temporary partial disability benefits as well as permanent partial disability benefits. Under the circumstances of that case we held that receiving both types of compensation would give employee double benefits not contemplated by the statute.[2] That case,

2. The *LeMieux* case was premised on the theory that permanent partial disability benefits compensate an employee for presumed wage loss due to his disability, as was held in *Boquist v. Dayton-Hudson Corp.*, 297 Minn. 14, 209 N.W.2d 783 (1973), and *Pramschiefer v. Windom Hospital*, 297 Minn. 212, 211 N.W.2d 365 (1973). The 1974 legislature by L.1974, c. 486, § 1, amended Minn.St.1973 Supp. § 176.021, subd. 3, by adding the following language:

and *Becker v. Schellinger*, Minn., 238 N.W.2d 889 (1976), which followed *Le-Mieux*, are unlike this case because here employee has been unable to obtain regular full-time employment in her disabled condition. The compensation board properly found her entitled to compensation for temporary partial disability under § 176.101, subd. 2. See, *Mechling v. Jasper Stone Co.*, 293 Minn. 309, 198 N.W.2d 561 (1972). An award for permanent partial disability assumes that the employee's earning capacity has diminished but not disappeared. If the employee is then unable to utilize her partial earning capacity because of her disability, an award of temporary disability benefits does not recompensate her for her permanent disability and no double compensation takes place.

Respondent is allowed $350 attorneys fees.

Affirmed.

OTIS, Justice (dissenting).

While this 26-year-old employee did suffer a work-related injury on January 11, 1972, while employed by Quality Park, the record indicates that she was able to resume full time work with a different employer by November 14, 1973. She was perfectly capable of performing that job but left it because she was pregnant.

On June 10, 1974, she returned to Quality Park and operated a clasp machine on the first shift without any difficulty. In August 1974 she requested and secured a transfer to the second shift, not because of her injury, but for personal reasons.

On the second shift she was assigned a medium operating machine since all the machines using a lighter stock had already been assigned an operator. On September 6, 1974, she quit her job entirely, telling her foreman that she was leaving because her fellow employees would not help her move cartons of stock from the floor to a skid. Quality Park's plant superintendent regarded her termination as voluntary.

It is not a coincidence that the date the employee chose to leave her job on the second shift at Quality Park was the date her attorney and doctor had, several months earlier, arranged her hospitalization to evaluate her permanent partial disability claim.

In early October 1974 she began work at Mackay Envelope Company and then at Lakeland Envelope Company on an "as needed" basis. On at least two occasions she has worked 50-hour weeks, and by her own testimony and that of medical witnesses she was physically able to work full time at the job of clasp machine operator which she had voluntarily left. The compensation judge found that except for the fact the employee remains at home to receive a call from Lakeland offering her part time work, "[t]here was no testimony as to any other diligent effort to look for work."

Under these circumstances, I would hold that these awards of temporary total and temporary partial disability payments were improper.

"* * * Compensation for permanent partial disability is payable concurrently and in addition to compensation for temporary total disability and temporary partial disability as set forth in Minnesota Statutes, Section 176.101, subdivisions 1 and 2, and for permanent total disability as defined in Minnesota Statutes, Section 176.101, Subdivision 5; and such compensation for permanent partial disability shall not be deferred pending completion of payment for temporary disability or permanent total disability, and no credit shall be taken for payment of permanent partial disability against liability for permanent total disability. *Liability on the part of an employer or his insurer for disability of a temporary total, temporary partial, and permanent total nature shall be considered as a continuing product and part of the employee's * * * injury or occupational disease and shall be payable accordingly. Permanent partial disability is payable for functional loss of use or impairment of function, permanent in nature, and payment therefore shall be separate, distinct, and in addition to payment for any other compensation.*" (Italics supplied.)

With respect to compensation claims based on injuries sustained after the effective date of the amendment (August 1, 1974), it appears that the compensation payable for permanent partial disability represents general damages rather than payment for loss in earning capacity.

PETERSON, Justice (dissenting).

I join in the dissent of Mr. Justice Otis.

WAHL, J., not having been a member of this court at the time of the submission, took no part in the consideration or decision of this case.