**Patrick E. TRACY, Respondent,**

v.

**STREATER/LITTON INDUSTRIES, et al., Relators.**

**George E. GEIER, Respondent,**

v.

**DOYLE CONNOR COMPANY, et al.,**

**and**

**Lumberman's Mutual Insurance Co., Defendant.**

**TRAVELERS INSURANCE COMPANY, intervenor, Respondent,**

**Leonard Schuft, Respondent,**

v.

**FARMERS UNION COOP OIL ASSOCIATION, et al., Relators.**

**Nos. 49322, 49182 and 49555.**

Supreme Court of Minnesota.

Sept. 7, 1979.

Van Eps & Gilmore and Curtis C. Gilmore, Minneapolis, for Streater/Litton Industries, et al.

Hansen, Dordell & Bradt and Gene P. Bradt, St. Paul, for Doyle Connor Company, et al.

Hansen, Dordell & Bradt and Gene P. Bradt, St. Paul, for Farmers Union Coop Oil Associates, et al. relators.

Leighton, Meany, Cotter & Enger and R. A. Cotter, Austin, for Tracy.

Joseph J. Grill, St. Paul, for Travelers Ins. Co.

Peterson & Goodman and Michael B. Goodman, Rochester, for Geier.

Roger L. Gilmer, Hutchinson, for Schuft.

Lommen & Cole and Thomas R. Jacobson, Minneapolis, for amicus curiae in No. 49322.

Abrams & Spector and John J. Horvei, Minneapolis, for amicus curiae in Nos. 49322 and 49182.

Lommen & Cole and Thomas R. Jacobson, Minneapolis, for amicus curiae in No. 49182.

OTIS, Justice.

We granted certiorari to review decisions of the Workers' Compensation Court of Appeals in three cases challenging the constitutionality of Minn.St. 176.021, subd. 3, as amended by L.1974, c. 486, § 1. The cases were presented and argued together.

The common and important issue, not argued below, is whether the statute unconstitutionally interferes with employer-insurer due process rights by providing that permanent partial disability benefits are payable concurrently with temporary or permanent total. The other issues, unique to the separate cases, will be stated with their facts.

In the first case, Patrick E. Tracy was employed by relator Streater/Litton Industries on August 5, 1976, when he experienced an immediate dull pain in his lower back and between his shoulder blades upon pushing with his right shoulder against a 1000-pound load of plywood. After the pain quickly increased and moved through his legs, he was hospitalized.

His attending physician testified that by August 26 he had experienced a sensory loss in his body below a T–6 level, with weakness in his legs but not complete loss of motor power. By September 8 he was completely paraplegic. By September 13 his left lower extremity was completely paralyzed, but he noticed some improvement in his right leg after undergoing rehabilitation. He also began having difficulty with his right arm, and he lost control of the bowel, bladder, and part of the sexual functions.

Three physicians were all of the opinion that some injury had occurred to respondent's spinal cord, but the exact etiology and course of his resulting disability were unknown.

The insurer paid temporary total disability and other benefits, and at the time of the hearing the temporary total disability payments were continuing. The compensation judge awarded permanent partial disability benefits, including a 15 percent multiple for simultaneous injuries (except for the right arm) under Minn.St. 176.101, subd. 3(46), and the court of appeals affirmed.

In addition to challenging the concurrent award for permanent partial disability, the employer and insurer question whether a simultaneous injury within the meaning of the statute occurred in this case.

The employee in the second case, George E. Geier, began working on highway and statewide construction for Doyle Connor Company in 1954. He was construction foreman from 1965 until his last day of employment in 1975. For eight to nine months a year he was exposed to dirt, lime, cement dust, and exhaust or chemical fumes, but he was also a heavy cigarette smoker from 1942 to 1975.

A history of chronic bronchitis was recorded regularly since 1963, and he developed chronic obstructive pulmonary disease with cor pulmonale, polycythemia, and tobacco abuse by 1966. As a result of his

condition, he suffered heavy coughing, wheezing, nausea, severe chest pains, and shortness of breath, with particular irritation from exposure to dust and fumes. His condition deteriorated until he was hospitalized on September 15, 1975, his last day of work.

Depositions of three physicians were considered on the employee's claims for temporary total and permanent partial disability benefits. Their opinions varied regarding the extent to which the dust and fumes aggravated the employee's condition, and the degree of disability to the lungs, heart, or the body as a whole.

The compensation judge concluded that the employee had contracted an occupational obstructive airway disease and heart damage arising out of and in the course of employment, and that he suffered a 90 percent permanent loss of bodily functions and organs. He awarded past and continuing temporary total disability benefits with permanent partial benefits payable in addition.

The court of appeals affirmed, one judge dissenting for insufficient evidence of causation, and added the finding that the smoking factor was inseparable from the damage caused by exposure to the other irritants.

The issues on appeal, independent of the concurrent payments, are whether causation and the extent of permanent disability were supported by the evidence.

In the third case, Leonard Schuft was employed by Farmers Union Coop Oil Association as an anhydrous ammonia tank filler when a ruptured hose exposed him to massive amounts of ammonia gas on April 27, 1976. He was paid total disability benefits[1] for injury to his pulmonary system and was subsequently awarded concurrent benefits for 50 percent permanent partial disability of the respiratory system to which the parties had stipulated.

While an appeal was pending, additional claims were filed for 30 percent permanent disability to the cardio-circulatory system and 20 percent to the cerebral-emotional system. On remand for a decision in accordance with a newly released opinion by this court regarding injury to internal organs,[2] the compensation judge took the case with the consent of the parties as three petitions "each claiming an individual permanent partial disability of a separate and distinct internal organ."

The issue was the extent of the permanent partial disability sustained as a result of alleged simultaneous injuries to internal organs. After a second hearing, the judge revised the original finding from 50 percent *of* the respiratory system to 50 percent "*due to injury to* the pulmonary system, an internal organ." (Italics supplied) He stated there was no measurable permanent injury to the brain or heart, but that the pulmonary system damage had consequentially affected the circulatory system, central nervous system and emotional state, and the 50 percent disability was to the body function as a whole.

In a second appeal, the employer and insurer again raised the constitutional issue of concurrent payments, and the employee added the question whether separate, aggregated ratings were required for claimed injuries to the heart and head. The court of appeals affirmed, and the same issues are before us with the related question whether the appeals court should have made an additional award for simultaneous injuries under Minn.St. 176.101, subd. 3(46).

1. The record is unclear regarding the type of total benefits paid in this case, but counsel for both sides agreed at trial that it was "permanent".

2. The controlling case was *Getter v. Travel Lodge*, 260 N.W.2d 177 (Minn.1977), released on November 10.

A. Constitutionality of Minn.St. 176.021, subd. 3.[3]

■ The employers and insurers in the three cases approach the 1974 amendment to this statute from the viewpoint of the workers' compensation law as originally enacted. They persuasively contend that the provision for permanent partial disability benefits no longer conforms to an underlying theory that compensation should be payable only for loss of earning capacity and not for physical injury as such. By permitting recovery for permanent "functional loss of use" in addition to total loss of earning power, the statute as relators construe it provides a double benefit and improperly extends the remedies to general damages beyond the total effect of a work-related injury on employability. What is worse, they argue, it does so without allowing employers any new defenses, thus upsetting the original statutory balance in the abrogation of respective common-law rights of recovery and of defenses to liability.

This alteration is characterized as violating two due process tests ascribed to judicial review of the workers' compensation law: 1) a reasonable substitute for pre-existing common-law rights between the employer and employee; and 2) a reasonable relationship to a permissible, legitimate legislative objective. The alteration is further criticized as inequitably imposing an oppressive financial burden on employers in the economic circumstances prevailing today.

With equal vigor, the employees disagree on every point. First, they claim that functional loss of use is directly related to unemployability. Second, concurrent recovery is not a double benefit because it reflects a separate factor of unemployability, and is not general damages because it still represents loss of earning capacity. Third, it does not upset the original balance of trade-offs by adding a benefit to the statutory contract as a whole because the contract still requires a showing of cause, provides statutory defenses, and limits recovery to a fixed schedule.

As viewed by the employees, the legislative objective is permissibly and legitimately the public welfare. Although the amendment unquestionably made recovery concurrent, the amount is still fixed and does not arbitrarily or unreasonably exceed a permissible limit or approach the type or amount of recovery potentially available from a jury.

1. We cannot perceive the logic of the employers' argument that concurrent recovery is both a double benefit and general damages. Since they maintain the benefits pay for tort damages beyond wage loss, they are compelled to admit there is no duplication. By the same reasoning, we cannot agree with the employees that concurrent recovery for total wage loss and impairment of function is neither a double benefit nor general damages. Since they maintain the benefits pay for loss of earning power, they are compelled to acknowledge a duplication.

Logic and consistency require us to adhere at the outset to our earlier view ex-

3. The statute, as amended in 1974, provides in pertinent part: " * * * *Compensation for permanent partial disability is payable concurrently and in addition to compensation for temporary total disability and temporary partial disability* as set forth in section 176.101, subdivisions 1 and 2, *and for permanent total disability* as defined in section 176.101, subdivision 5; and such compensation for permanent partial disability shall not be deferred pending completion of payment for temporary disability or permanent total disability, and no credit shall be taken for payment of permanent partial disability against liability for permanent total disability. *Liability on the part of an employer or his insurer for disability of a temporary total, temporary partial, and permanent total nature shall be considered as a continuing product and part of the employee's inability to earn or reduction in earning capacity due to injury or occupational disease and shall be payable accordingly. Permanent partial disability is payable for functional loss of use or impairment of function, permanent in nature, and payment therefore shall be separate, distinct, and in addition to payment for any other compensation.*" (Italics supplied.)

pressed in *Ahoe v. Quality Park Products,* 258 N.W.2d 885, 889, n.2 (Minn.1977), that permanent partial disability benefits must compensate for loss distinguishable from reduced earning capacity because total disability benefits already reflect the maximum in unemployability.[4] Accordingly, we hold that the legislature has made impairment of function compensable for its own sake in the form of damages separate and distinct from wage loss.

2. After the amendment was enacted in 1974, we acknowledged in *Rozales v. Peerless Welder, Inc.,* 311 Minn. 6, 10, 246 N.W.2d 851, 853 (1976), that the legislature had authorized concurrent payments in response to our denial of them. See, footnote 4 *supra.* Subsequently, in *Ahoe, supra,* we noted that the amendment expanded the theory of recovery in our workers' compensation law.

Contrary to relators' charge that the amendment was a legislative attempt to circumvent our decisions in *Pramschiefer* and *Boquist,* footnote 4 *supra,* no rulings on the propriety of recovery beyond wage loss had been made. We did not say that such recovery would be improper, but merely that it was unavailable under the pre-amendment statute. The question of propriety is now before us for the first time.

Relators urge that the extended damages are improper on three grounds: 1) they upset the balance of rights and obligations because they are not matched by an extended defense; 2) they are not related to the purposes of the compensation act because they reflect a personal instead of an industrial cost; and 3) they arbitrarily impose an oppressive burden on employers. From an examination of our own cases and Supreme Court decisions, we conclude that neither a one-for-one balance nor a reasonable substitute for abrogated common-law rights is required for validity. Further, to say that a work-related functional loss of use of a part of the body is not a cost of production is to ignore the requisite connection between the injury and employment despite the distinction of the damages from wage loss. While the recovery may reach substantial proportions in severe cases, we cannot say that the legislature acted arbitrarily in prospectively imposing the additional burden on employers, and we hold that the statute as amended is constitutional.

A trade-off is the basis of the abrogation of common-law rights in the compensation contract between employers and employees,[5] but a constitutional evaluation looks to the ultimate scheme in its entirety. We followed this prevailing approach in *Breimhorst v. Beckman,* 227 Minn. 409, 436, 35 N.W.2d 719, 736 (1949), where we upheld the pre-amendment scheme as an adequate substitute for the employee's right to sue

4. Prior to the amendment, on the rationale that impairment of earnings was the only theory of recovery in the workers' compensation scheme, and that total disability was maximum at any one time, we had determined that concurrent recovery of presumed partial wage loss with actual total wage loss would confer an unauthorized double benefit. See, *Boquist v. Dayton-Hudson Corp.,* 297 Minn. 14, 209 N.W.2d 783 (1973); *Pramschiefer v. Windom Hospital,* 297 Minn. 212, 211 N.W.2d 365 (1973). *Cf., State Compensation Insurance Fund v. Workers' Compensation Appeals Board,* 70 Cal. App.3d 599, 606, 139 Cal.Rptr. 41, 44 (1977) ("a worker's ability to compete in the labor market at a given time cannot be diminished beyond a 100 percent total permanent disability"); Larson, 2 Workmen's Compensation Law, § 59.41. ("At a given moment in time, a man can be no more than totally disabled * * *.")

In *Ahoe* we said: "With respect to compensation claims based on injuries sustained after the effective date of the amendment (August 1, 1974), it appears that the compensation payable for permanent partial disability represents general damages rather than payment for loss in earning capacity." 258 N.W.2d 890, note 2.

5. The cases before us concern only the contracting parties and must be distinguished from those involving the abrogation of third party common-law rights. Accordingly, our invalidation of a provision which abrogated such a right without a reasonable substitute is not precedent for a decision here. See, *Carlson v. Smogard,* 298 Minn. 362, 215 N.W.2d 615 (1974); *Haney v. International Harvester Co.,* 294 Minn. 375, 201 N.W.2d 140 (1972).

for all appropriate negligence damages.[6] Employers themselves stated at oral argument that the overriding considerations of the law as a whole determined its validity in *Breimhorst.* And the United States Supreme Court in 1918 dispelled the notion that it would strike down a statute for failing to provide a one-for-one balance instead of examining it in its entirety.[7]

In *Breimhorst* we relied for other reasons on the Supreme Court decision in *New York Central R. R. Co. v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917), which also said a New York statute did not violate due process guarantees because it provided a reasonable substitute for common-law tort rights. 243 U.S. 201, 37 S.Ct. 252, 61 L.Ed. 674. But as we cautioned in *Haney v. International Harvester Co.,* 294 Minn. 375, 384, 201 N.W.2d 140, 145 (1972), White did not involve the issue whether a reasonable substitute was required. We therefore articulated our own due process test, saying that

"* * * a common-law right of action may be abrogated without providing a reasonable substitute if a permissible legislative objective is pursued." 294 Minn. 385, 201 N.W.2d 146.

Preservation of the public welfare is the objective of the state's exercise of its inherent police power, "which is as flexible and adaptable as the vital needs of our changing society," and a "wide discretion is vested in the legislature in determining when a public welfare need exists and in the selection of an appropriate remedy." *Breimhorst v. Beckman,* 227 Minn. 409, 430, 35

N.W.2d 719, 732, 733 (1949) (citations omitted.) Since the amended statute still attempts to remedy the disabling effects of industry, we would not regard as a constitutional infirmity any failure of the amended statute to replace the employers' lost defenses. Consequently, there is no need to determine whether the statute even as a whole provides a reasonable substitute.

Employers also urge that general damages beyond wage loss are not reasonably related to the original purpose of compensating quickly for reduced earning capacity. The statute "must be reasonably designed to accomplish its purpose without going beyond the reasonable demands of the occasion." *Breimhorst v. Beckman,* 227 Minn. 409, 430, 35 N.W.2d 719, 732 (1949). But in our view the "purpose" identified by employers is merely a theory of recovery, while the legislative objective since compensation laws were first enacted has remained "the protection of the lives and safety of those concerned * * *." *New York Central R. R. Co. v. White,* 243 U.S. 188, 207, 37 S.Ct. 247, 254, 61 L.Ed. 667, 677 (1917).

These laws have preserved for the employer the same opportunity the employee had at common law to "[take the risk] into consideration in fixing the rate of wages;" and, by virtue of the employer's position in the relationship, he alone has had the additional opportunity "to charge the loss as a part of the cost of the product of the industry." *Arizona Employers' Liability Cases,* 250 U.S. 400, 422, 39 S.Ct. 553, 556, 557, 63 L.Ed. 1058, 1067 (1919). As we elaborated

6. The law was challenged as unconstitutional in *Breimhorst* partly for its failure to provide an adequate remedy. 227 Minn. 430, 434, 35 N.W.2d 732, 735.
    Authorities for viewing the whole scheme as a substitute for a common-law or statutory action were cited in footnote 19.

7. *Arizona Employers' Liability Cases,* 250 U.S. 400, 427, 39 S.Ct. 553, 558, 63 L.Ed. 1058, 1069 (1919). The Court said: "In spite of our declaration that no opinion was intimated, this is treated as an intimation that a statute such as the one now under consideration, creating a new and additional right of action and allowing

no defense (if the conditions of liability be shown) unless the accident was caused by the negligence of the injured employee, would be regarded as in conflict with the due process clause. We cannot, however, regard this statute as anything else than a substitute for the law as it previously stood; whether it be a proper substitute was for the people of the State of Arizona to determine; but we find no ground for declaring that they have acted so arbitrarily, unreasonably, and unjustly as to render their action void."

in *Breimhorst, supra*: " \* \* \* The increased industrialization of modern society has been accompanied by the increased industrial disability of employes, a burden which individual employes cannot bear and which constitutes a burden that can be borne equitably and expeditiously only by placing it upon industry as a cost of production." 227 Minn. 430, 35 N.W.2d 733.

We are convinced that the amended statutory scheme continues to serve and is clearly related to the time-honored purposes of spreading the cost of industrial injuries and preventing disabled employees from becoming public charges.

To the claim that these damages are unrelated because they are personal rather than industrial costs, we answer with the eloquent statement of Justice Holmes in the *Arizona Employers' Liability Cases, supra*, on the propriety of awarding damages for pain and suffering:

" \* \* \* It is said that the pain cannot be shifted to another. Neither can the loss of a leg. But one can be paid for as well as the other. It is said that these elements do not constitute an economic loss, in the sense of diminished power to produce. They may. \* \* \* But whether they do or not they are as much part of the workman's loss as the loss of a limb. The legislature may have reasoned thus. If a business is unsuccessful it means that the public does not care enough for it to make it pay. If it is successful the public pays its expenses and something more. It is reasonable that the public should pay the whole cost of producing what it wants and a part of that cost is the pain and mutilation incident to production. By throwing that loss upon the employer in the first in-

stance we throw it upon the public in the long run and that is just. If a legislature should reason in this way and act accordingly it seems to me that it is within constitutional bounds." (Citations omitted.) 250 U.S. 433, 39 S.Ct. 560, 63 L.Ed. 1072 (Holmes, J., concurring).

Finally, employers look to equity for their argument that the statute is unreasonable because concurrent recovery imposes upon them a harsh and oppressive financial burden in today's economy. It is settled law that a statute is presumed constitutional unless its challengers clearly show it is otherwise,[8] and that the wisdom of legislation is not a consideration for the courts.[9]

The ultimate test is whether the statute is so arbitrary, unreasonable and unjust as to be repugnant to the due process guarantees. For several reasons, it does not fit that description. It preserves all of the statutory defenses and the requirement that the employee must prove the injury is work-related. It also preserves a fixed schedule for the amounts recoverable which can be statistically predicted and insured against, and spread over the cost of production. While we caution that employers' liability at some point could exceed a reasonable limit, we cannot say that point is reached here.

If the amendment retroactively imposed the additional burdens, there is no doubt the employers' vested contract rights would have been impaired; but limited as it is to prospective effect only, Minn.St. 176.021, subdivision 3, is hereby held to be constitutional.[10]

### B. *Tracy v. Streater/Litton Industries*

The other issue here is whether simultaneous injuries within the meaning of

---

8. See, *Schwartz v. Talmo*, 295 Minn. 356, 363, 205 N.W.2d 318, 323 (1973); *Minneapolis Gas Co. v. Zimmerman*, 253 Minn. 164, 173 and cases cited in note 9, 91 N.W.2d 642, 650 (1958).

9. See, *Starkweather v. Blair*, 245 Minn. 371, 395, 71 N.W.2d 869, 884 (1955); *Lee v. Del-*

mont, 228 Minn. 101, 108, 36 N.W.2d 530, 536 (1949).

10. See, *Miller v. Norris Creameries*, 306 Minn. 79, 84, 235 N.W.2d 203, 205 (1975); *Yeager v. Delano Granite Works*, 250 Minn. 303, 307, 84 N.W.2d 363, 367 (1957).

Minn.St. 176.101, subd. 3(46)[11] occurred in this case. Three physicians agreed that the employee suffered an injury to his spinal cord, but none knew the exact etiology and course of his quickly progressive sensory loss. Relators' theory is that the statute does not apply to undiagnosed and progressive disabilities because they do not take place or operate at the same time. Respondent's theory is that his condition was traced to his spinal cord and the onset of all the progressive aspects included in the 15 percent multiple occurred at the time of the injury. Both the compensation judge and the court of appeals viewed the injury as the onset of the subsequent disabilities to determine they were simultaneous.

Where progressive disabilities occur within a short time after a single injury, and the record nowhere discloses any intervening cause that might have occurred, we see no reason to deny recovery merely because the results are delayed and cannot be physiologically traced to the injury with medical precision. The statute requires neither absolute simultaneity nor absolute proof. Accordingly, we hold that simultaneous injuries occurred and the additional 15 percent award was proper.

C. *Geier v. Doyle Connor Co.*

■ The issues unique to this case are whether causation and the 90 percent extent of permanent partial disability were supported by the evidence.

■ 1. The medical opinions agreed that the employee suffered from lung disease while exposed to the irritating materials which affected his condition, but only one stated the effect was significant. It was entitled to the same weight as the others, however, as none of the opinions could be proved with certainty, and evidence sufficient to prove causation need not be able to

satisfy a medical test. *Casey v. Northern States Power Co.*, 247 Minn. 295, 309, 77 N.W.2d 67, 76 (1956); see, *Boldt v. Jostens, Inc.*, 261 N.W.2d 92 (Minn.1977); *Pommeranz v. State*, 261 N.W.2d 90 (Minn.1977).

■ The court of appeals' finding that the damage from smoking was inseparable from the work-related damage is consistent with the physicians' inability to sort out the effects of each cause. Where the evidence is conflicting, it is to be resolved by the court of appeals, and its decision will not be disturbed unless reasonable minds would reach contrary conclusions on the evidence or inferences to be drawn therefrom. *Naebers v. Shell Oil Co.*, 302 Minn. 544, 224 N.W.2d 160 (1974).

2. Relators object to the 90 percent disability finding as based on cumulative evidence because conflicting opinions were relied upon for cause and degree of disability. We observe that all three experts related the work environment to the disability and included percentage estimates of injury to internal organs or to the body as a whole.

Consequently, the evidence is not cumulative and the case is distinguishable from *White v. Bendix Home Systems, Inc.*, 255 N.W.2d 50 (Minn.1977), where the expert who related the injury to the employment did not relate it to the disability. The evidence there was cumulative because two opinions were required in order to find both cause and extent of the injury.

■ The rule is settled that this court looks to the whole evidence to determine whether an inference upon which a finding rests is reasonably supported. See, *Maher v. Duluth Yellow Cab Co.*, 172 Minn. 439, 442, 215 N.W. 678, 679 (1927), cited in *Roman v. Minneapolis Street Railway Co.*, 268 Minn. 367, 377, 129 N.W.2d 550, 557 (1964). The extent of permanent partial disability is within the discretion of the compensation

---

11. The simultaneous injury statute provides in part: "In cases of permanent partial disability caused by simultaneous injury to two or more members, the applicable schedules in this subdivision shall be increased by 15 percent. This clause shall not apply when the injuries are compensated under paragraphs 22 to 37 inclusive, of this subdivision."

judge to estimate on the basis of the "nature and extent of the injury and the relative importance of the internal organ or organs injured." *Getter v. Travel Lodge*, 260 N.W.2d 177, 180 (Minn.1977). There was ample evidence for the estimate made in this case.

### D. *Schuft v. Farmers Union Coop Oil Assoc.*

The employee in this case contends that the effect of his lung injury on his circulatory system and emotional state entitles him to separate, aggregated disability ratings and an award for simultaneous injuries.

1. With regard to the circulatory system, an internal organ, the issue is controlled by *Getter v. Travel Lodge*, 260 N.W.2d 177 (Minn.1977), which requires an overall rating of disability to body function as a whole.[12] Aggregation of separate ratings is inappropriate because the degree of disability to an organ does not necessarily equal the degree of disability to the body as a whole, and aggregation could easily result in the impossible situation where whole disability would be more than 100 percent. See, 260 N.W.2d 180.

Although a separate rating could be made for a head injury, the minimal evidence related to the emotional system; we agree with the findings that it does not support the assertion that a head injury occurred.[13]

2. The claim for simultaneous injury benefits applies to injuries to two or more "members" when the injuries are not compensated under the provisions relating to ears, eyes, legs, arms, hands, and feet.[14] Since those provisions do not include internal organs or the emotional system, the 15 percent multiple would not apply in this case even if the injuries were shown to be simultaneous.

The decisions in all three cases are affirmed.

TODD, J., took no part in the consideration or decision of this case.

---

12. The internal organ statute, Minn.St. 176.101, subd. 3(40), provides: "For permanent partial disability resulting from injury to any internal organ, including the heart, 66⅔ percent of the daily wage at time of injury for that proportion of 500 weeks which is the proportionate amount of *permanent partial disability caused to the entire body by the injury* and is determined from competent testimony adduced at a hearing before a compensation judge, a commissioner, or the worker's compensation court of appeals; * * *." (Italics supplied.)

13. The head injury statute, Minn.St. 176.101, subd. 3(39), provides: "For head injuries resulting in permanent partial disability, 66⅔ percent of the daily wage at the time of injury for that proportion of 500 weeks which is represented by the percentage of such permanent partial disability as is determined from competent testimony adduced at a hearing before a compensation judge, a commissioner, or the board; * * *."

14. See, footnote 11 *supra*.